# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| THE WACKENHUT CORPORATION | ) | |
| | ) | |
| Plaintiff | ) | Case No. 08-C-2053 |
| | ) | |
| v. | ) | Judge Kendall |
| | ) | |
| SERVICE EMPLOYEES INTERNATIONAL | ) | Magistrate Judge Schenkier |
| UNION, LOCAL 1, *et. al.* | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## MOTION TO DISMISS OF DEFENDANTS SEIU LOCAL 1, THOMAS BALANOFF, MONA BALLENGER, AND EDWARD BOWEN

Defendants Service Employees International Union Local 1 ("Local 1"), Thomas Balanoff, Mona Ballenger, and Edward Bowen hereby move, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiff's Complaint in its entirety. The grounds for this Motion are fully set forth in the accompanying Memorandum of Law which is incorporated herein by reference.

WHEREFORE, for the reasons stated in the accompanying Memorandum of Law, Defendants Local 1, Balanoff, Ballenger, and Bowen respectfully request that the Court grant its motion to dismiss Plaintiff's Complaint in its entirety.

Respectfully Submitted,

*/s/ Alexia Kulwiec*
ALEXIA M. KULWIEC
LESLIE J. WARD
STEVEN M. STEWART
SEIU Local No. 1
111 East Wacker Drive
Suite 2500
Chicago, IL 60601
(312) 233-8712

_/s/ Julia Penny Clark_
JULIA PENNY CLARK*
DANIEL A. ZIBEL*
Bredhoff & Kaiser PLLC
805 Fifteenth Street N.W.
Suite 1000
Washington, DC 20005
(202) 842-2600

*Counsel for Defendants SEIU Local 1, Thomas Balanoff,
Mona Ballenger, and Edward Bowen*

* admitted *pro hac vice*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 27th day of June, 2008, a copy of the foregoing MOTION TO DISMISS OF DEFENDANTS SEIU LOCAL 1., THOMAS BALANOFF, MONA BALLENGER, AND EDWARD BOWEN was filed electronically with the Clerk of the Court was served via the CM/ECF system upon all counsel of record in this case.  Pursuant to Local Rule 5.2(e), a courtesy copy of this motion will be delivered to the courtroom deputy's office in Room 2316-A of the Dirksen Building.


*/s/ Julia Penny Clark*
Julia Penny Clark

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THE WACKENHUT CORPORATION | ) | |
| | ) | |
| Plaintiff | ) | Case No.  08-C-2053 |
| | ) | |
| v. | ) | Judge Kendall |
| | ) | |
| SERVICE EMPLOYEES INTERNATIONAL | ) | Magistrate Judge Schenkier |
| UNION, LOCAL 1, *et. al.* | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OF DEFENDANTS SEIU
LOCAL 1, THOMAS BALANOFF, MONA BALLENGER, AND EDWARD BOWEN**

**INTRODUCTION**

Wackenhut's Amended Complaint [Dkt. No. 10] rests on Article 23 of a collective
bargaining agreement between the Building Owners and Managers Association of Chicago
("BOMA") and SEIU Local 1 ("Local 1").  That collective bargaining agreement generally
provided for the wages, hours, and other terms and conditions of employment (*i.e.,* the
mandatory subjects of bargaining under federal labor law) that applied to BOMA's building
security employees in downtown Chicago who were represented by Local 1. Article 23 in
particular addressed a classic subject of collective bargaining—the terms on which BOMA
members were permitted to subcontract to some other employer the building security work that
otherwise would be covered by their collective bargaining agreement and performed by
employees whom Local 1 represents.

Wackenhut previously filed an unfair labor practice charge regarding Article 23.  That
charge was tried before an Administrative Law Judge ("ALJ") of the National Labor Relations
Board ("NLRB") and it resulted in a decision by the NLRB that BOMA violated section 8(e) of
the National Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. § 158(e), by the particular
manner in which it implemented Article 23.

Wackenhut now attempts to recycle its allegations about Article 23 against Local 1 only, this time, as an antitrust claim and as a damages action under section 303 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 187(b). But, as we demonstrate in this memorandum, the actions of Local 1 are exempt from the antitrust laws, and Wackenhut's claim under section 8(e) is cognizable only by the NLRB. Wackenhut has failed to state any cause of action on which this Court can grant relief, and the lawsuit must be dismissed under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

### STATEMENT OF FACTS[1]

The Building Owners and Managers Association of Chicago ("BOMA") is an association of employers that own or operate 270 commercial office buildings in the City of Chicago and 150 employers that provide building services to commercial office buildings in Chicago. Plaintiff's First Amended Complaint ¶ 17 (hereinafter "Am. Compl."). ¶ 17. SEIU Local 1 ("Local 1") is an unincorporated labor organization that acts as the collective bargaining representative of building service employees in the Chicago area, including building service employees of BOMA members. *Id*. ¶ 11. Wackenhut is a provider of security services to government agencies and commercial customers throughout the United States. *Id.* ¶ 9.

---

[1] Consistent with Federal Rule of Civil Procedure 12(b)(6), this Statement of Facts reflects the facts asserted by Wackenhut in its Amended Complaint. In addition to these facts, however, Defendants' Statement refers to facts that were in the decision of the Administrative Law Judge ("ALJ") in the cognate proceeding in the National Labor Relations Board. *See Building Owners & Managers Ass'n of Chicago, Respondent, and The Wackenhut Corp., Service Employees Int'l Union Local No. 1, Party to the Contract*, No. 13-CE-127, 2007 WL 4570695 (N.L.R.B., Dec. 21, 2007) (attached hereto as Exhibit A) (hereinafter "ALJ Op."). That ALJ decision is referred to in the Amended Complaint. *See* First Amended Complaint ¶¶ 27, 29, 30, 31, 32, 72, 74, 75, 76. "Documents referred to in, but not attached to, a plaintiff's complaint that are central to its claim may be considered in ruling on a Rule 12(b)(6) motion if they are attached to the defendant's motion to dismiss." *Duferco Steel, Inc. v. M/V Kalisti*, 121 F.3d 321, 324 n.3 (7th Cir. 1997); *see also Truserv Corp. v. Chaska Bldg. Ctr., Inc.*, No. 02 C 1018, 2003 WL 924509, at *4 n.7 (N.D. Ill., Mar. 6, 2003). The court is also permitted to "take judicial notice of matters of public record without converting a motion for failure to state a claim into a motion for summary judgment." *General Elec. Cap. Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997).

Specifically, Wackenhut enters into contracts with BOMA members, and non-BOMA members, to provide security services to commercial office buildings in downtown Chicago. *Id.* ¶ 10. [2]

Between April 26, 2004 and April 29, 2007, *id.* ¶¶ 3, 24, Local 1 was party to at least two collective bargaining agreements relevant here. *First*, during this time, Local 1 and BOMA were parties to a multi-employer collective bargaining agreement entitled the Security Services Agreement (SSA). The SSA set the wages, hours, and conditions of employment for security employees working for BOMA members. *Id.* ¶ 24. In Article 23 of the SSA, BOMA and Local 1 also agreed that, if a BOMA member subcontracted security work covered by the SSA to a subcontractor, the BOMA member would require that subcontractor to meet the SSA's standards of wages, hours, and working conditions for the security employees doing that work. *Id.* ¶¶ 3, 24; ALJ Op. at 7-8. This clause is hereinafter referred to as the "all standards" or "subcontracting" clause, *see e.g.,* ALJ Op. at 12. *Second*, during this time, Local 1 and Wackenhut were parties to a collective bargaining agreement that governed the wages, hours, and terms and conditions of employment for Wackenhut's security employees working in the downtown Chicago. ALJ Op. at 18. That collective bargaining agreement stated that, if any conflict existed between the terms of the SSA and the terms of the Wackenhut agreement, the terms of the SSA would govern. *Id.*

On or about October 4, 2006, Wackenhut filed an unfair labor practice charge against BOMA and Local 1 with the NLRB that alleged, *inter alia*, that the subcontracting clause in Article 23 of the SSA violated section 8(e) of the NLRA, as amended, 29 U.S.C. § 158(e). Am. Compl. ¶ 27. In March of 2007, the General Counsel of the NLRB directed that a section 8(e) Complaint issue against both Local 1 and BOMA. Am. Compl. ¶ 29. The case was heard before an NLRB Administrative Law Judge on June 11 and 12, 2007. "The complaint was amended at the hearing to drop Local 1 as a Respondent, leaving its participation to the proceedings as a Party to the Contract." ALJ Op. at 1 n.1.

The ALJ's decision, which issued on December 21, 2007, *see* Am. Compl. ¶ 30, made two rulings pertinent to this case. First, as noted by Wackenhut, the ALJ ruled that BOMA maintained and applied Article 23 of the SSA to require security subcontractors to follow the

---

[2]    While Wackenhut is one of the largest security services providers in the United States, the allegations of the Amended Complaint focus entirely on the "provision of security services in office buildings" in "Downtown Chicago." Am. Compl. ¶¶ 39-40.

exact terms of the SSA on wages, hours, and terms and conditions of employment, including the requirement of making contributions to the benefit funds that Local 1 and BOMA jointly maintain. The ALJ found that by doing so, BOMA turned Article 23 into a "union signatory" clause, thus violating section 8(e). *Id.* ¶ 31. Second, and omitted by Wackenhut in their Amended Complaint, the ALJ found that "the work of security officers was traditionally performed by bargaining unit members, and therefore the work is fairly claimable by Local 1," ALJ Op. at 28, thus recognizing that BOMA and Local 1 could lawfully include a subcontracting clause that required any security subcontractor to adhere to the "union standards" under the SSA agreement. *See generally, e.g., Building Material and Const. Teamsters No. 216*, 198 NLRB 1046 (1972).

Neither Wackenhut, BOMA, nor Local 1 filed exceptions to the ALJ's decision, and on February 5, 2008, the NLRB adopted the ALJ's findings and conclusions and issued its final order requiring BOMA to cease enforcing the clause as a "union signatory" clause. Am. Compl. ¶ 32. On April 10, 2008 this suit was filed. [Dkt. No. 1]. The First Amended Complaint was filed on April 23, 2008. [Dkt. No. 10]. As the Amended Complaint implicitly acknowledges, the subcontracting clause is no longer in effect as an improper "union signatory" clause. *See* ALJ Op. at 33.

## STANDARDS OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests whether the complaint, as it must, "allege[s] 'enough facts to state a claim to relief that is plausible on its face.'" *Limestone Dev. Corp. v. Village of Lemont, Ill.*, 520 F.3d 797, 803 (7th Cir. 2008) quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). In this regard, in a "complex antitrust . . . case a fuller set of factual allegations . . . may be necessary to show that the plaintiff's claim is not 'largely groundless.'" *Limestone Dev. Corp.*, 520 F.3d at 803.

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) tests whether the court has the statutory authority to hear and decide the dispute. Because defendants have moved for dismissal of Claim 4 pursuant to Rule 12(b)(1), Wackenhut bears the burden of demonstrating that the court has subject matter jurisdiction over that claim. *Rogers v. Sugar Tree Prods.,* 7 F.3d 577, 581 (7th Cir. 1993).

With these principles in mind, as we now show, Counts 1-3 of the Amended Complaint cannot legally stand under Rule 12(b)(6), and Count 4 cannot stand under Rules 12(b)(1) and 12(b)(6).

## ARGUMENT

### I.  CLAIMS 1-3 OF THE AMENDED COMPLAINT MUST BE DISMISSED BECAUSE THEY PLAINLY FALL WITHIN THE LABOR EXEMPTION TO THE ANTITRUST LAWS.

An "inherent tension" exists in the federal law "between national antitrust policy, which seeks to maximize competition, and national labor policy, which encourages cooperation among workers to improve the conditions of employment," *H. A. Artists & Assocs., Inc. v. Actors' Equity Ass'n*, 451 U.S. 704, 713 (1981).  While the national labor policy protects unions' efforts to standardize wages, hours, and working conditions throughout a labor market, *see e.g., Local 24 of the Int'l Bhd. of Teamsters v. Oliver*, 358 U.S. 283, 294 (1959), "[u]nion success in . . . standardizing wages ultimately will affect price competition among employers." *Connell Constr. Co., Inc. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 621-22 (1975).  Given that tension, Congress and the Courts have fashioned two different labor exemptions from the antitrust laws because "the goals of federal labor law never could be achieved if this effect on business competition were held a violation of the antitrust laws." *Id.  See generally Mid-America Reg'l. Bargaining Ass'n v. Will County Carpenters Dist. Council*, 675 F.2d 881 (7th Cir. 1982); *Reed v. Advocate Health Care*, Nos. 06 C 3337, 06 C 3569, 2007 WL 967932, at*2 (N.D. Ill. March 28, 2007) (recounting history of labor exemptions).

Where a labor union enters into an agreement pertaining to wages, hours, and working conditions with a non-labor party, the "non-statutory" exemption to the Sherman Act applies. *See, e.g., Mid-America*, 675 F.2d at 890 (finding the non-statutory exemption applicable). Additionally, a "statutory" exemption to the Sherman Act often applies when a union acts unilaterally to eliminate competition over wages, hours, and working conditions.  While as a general matter this statutory exemption applies only to unilateral actions of a labor union, the Seventh Circuit has applied this exemption to provisions of a collective bargaining agreement such as the SSA.  *Id.* at 886-87.  As we now show, Local 1's conduct is exempt from antitrust liability under both of the two exemptions.

a.    **Claims 1-3 of the Amended Complaint Must Be Dismissed Because Defendants' Alleged Behavior Falls Squarely Within the Established Non-Statutory Labor Exemption to the Antitrust Acts.**

The non-statutory labor exemption to the Sherman Act "recognizes that, to give effect to federal labor laws and policies and to allow meaningful collective bargaining to take place, some restraints on competition imposed through the bargaining process must be shielded from antitrust sanctions." *Brown v. Pro Football, Inc.*, 518 U.S. 231, 237 (1996), *citing Connell*, 421 U.S. at 622 (noting that "federal labor law's goals could never be achieved if ordinary anticompetitive effects of collective bargaining were held to violate the antitrust laws") (internal quotations omitted); *see also Meat Cutters v. Jewel Tea,* 381 U.S. 676, 689-90 (1965); *United Rentals Highway Techs. v. Indiana Constructors*, 518 F.3d 526, 531 (7th Cir. 2008).

The Seventh Circuit's precedent makes clear that the "boundaries" of the non-statutory exemption are to be "determined by attempting an accommodation between national labor policy and antitrust laws," based on "an examination of the impact of a given agreement on the labor and product markets." *Mid-America*, 675 F.2d at 892.  As a general rule, if a collective bargaining agreement is primarily addressed to the labor market and to standardizing wages, hours, and working conditions in that market, its effect on competition among employers in the product market is exempt from liability under the antitrust laws.  *Id.*

1.    **The collective bargaining agreement between Local 1 and BOMA is primarily addressed to the labor market.**

The provisions of the SSA—including both the provisions setting wages, hours, and working conditions of security employees of BOMA members as well as the provisions setting those standards for security employees of any subcontractors—are primarily addressed to the labor market.  *First*, by providing that BOMA and its subcontractors must adhere to the wages, hours, and working conditions outlined in the SSA, the agreement standardizes those conditions of employment within the labor market for security employees in order to eliminate competition over wages, hours, and working conditions in that market.  Accomplishing that goal is at the core of protected union activity. *See Connell*, 421 U.S. at 622 (approving a "strong labor policy favoring the association of employees to eliminate competition over wages and working conditions"); *United Mine Workers v. Pennington*, 381 U.S. 657, 664 (1965) ("The union benefit

from the wage scale agreed upon is direct and concrete and the effect on the product market, though clearly present, results from the elimination of competition based on wages among the employers in the bargaining unit, which is not the kind of restraint Congress intended the Sherman Act to proscribe."); *see also Oliver*, 358 U.S. at 294 (protecting the union's right to establish standard wages and working conditions even where the steps taken could reduce competition in the product market).

*Second*, the SSA's subcontracting clause serves to preserve the work that security employees whom Local 1 represents are currently doing for BOMA members, and to recapture the work that security employees it represents traditionally have done for BOMA members. *See generally National Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612 (1967); *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203 (1964). A subcontracting clause in a collective bargaining agreement—by either forbidding an employer to subcontract work to another entity or by requiring that any subcontractor provide wages and other working conditions that are equivalent to those in the union's collective bargaining agreement—serves to ensure that work traditionally performed by employees represented by the union and covered by the agreement is not subcontracted to an employer who undercuts the wages and working conditions provided in the collective bargaining agreement. *See Fibreboard*, 379 U.S. at 210-212.

### 2. The effects of the SSA on competition among employers were only the result of eliminating competition in the labor market.

As discussed, *supra*, by acting (1) to standardize the wages, hours, and working conditions of security employees working in the downtown Chicago office building labor market; and (2) to preserve the work traditionally done by security employees under the SSA collective bargaining agreement, Local 1 was acting in the primary sphere of interests protected by federal labor law.

In *United Rentals*, the Seventh Circuit made clear that a subcontracting clause in a collective bargaining agreement that served to standardize wages, hours, and working conditions in a labor market and also to ensure that "the workers [the union] represented would have more work," was protected by the non-statutory exemption, even where the subcontracting clause "looks like an exclusionary practice." 518 F.3d at 531-33. The Court held that a collective bargaining agreement between a union and a multi-employer association, which set standardized

wages, hours, and working conditions for those employers and also required subcontractors to be union signatories,[3] was protected against Sherman Act attack by the non-statutory exemption. *Id.* at 533. *First*, the Seventh Circuit noted that the subcontracting provision was an integral part of a bargaining agreement setting standard wages and working conditions for the union-represented employees of the multi-employer association—a factor that demonstrates that the agreement is primarily directed at the labor market and at eliminating competition over wages and working conditions in that labor market. *Id.* at 533. The same is true here. *Second*, the Seventh Circuit noted in *United Rentals* that the union bargained for that subcontracting clause "so that the workers it represented would have more work." *Id.* The same is also true here. Because the ALJ found that the security work in BOMA members' building was traditionally performed by security employees represented by Local 1, and was thus "fairly claimable" by the Local 1, *see* ALJ Op. at 28-30, Local 1 has a valid interest in preventing BOMA members from subcontracting that security work to employers that would provide substandard terms and conditions of employment. *See National Woodwork*, 386 U.S. at 644 (primary work preservation agreements not within the scope of sections 8(b)(4) and 8(e)). Applying these factors here, it is clear that, as in *United Rentals*, there is an "applicable labor-law policy . . . to offset the anticompetitive consequences of the clause." *United Rentals* 518 F.3d at 533.

Here, as the Seventh Circuit concluded in *United Rentals*, there is simply an "absence of traditional antitrust concerns" in the SSA. *Id.* BOMA members could have performed the security work themselves with employees represented by Local 1 under the SSA. If they had done so, the employees' wages, hours, and working conditions would have been those specified by the SSA. Local 1 had a legitimate interest in keeping BOMA members from taking that work from security employees represented by Local 1 and giving it to the employees of a subcontractor who would pay less in wages or benefits. These interests lie at the heart of national labor policy—*i.e.*, standardizing wages, terms, and conditions of employment in a single labor market in which the union represents employees, and preserving the work those employees are doing or have recently done—and the effect on competition among security subcontractors is simply a by-product of the elimination of such competition in this labor market. Such an agreement is squarely protected by the non-statutory exemption to the antitrust laws.

---

[3]    In *United Rentals*, the union signatory clause did not violate section 8(e) of the NLRA because of the construction industry proviso to section 8(e). 518 F.3d at 529-30.

The NLRB finding that the subcontracting clause violated section 8(e) of the NLRA, because BOMA required not only adherence to the standardized terms of the SA but also benefit fund contributions, does not have any impact on exemption from the Sherman Act. The parties to a collective bargaining agreement do not forfeit the labor exemption to the antitrust laws merely because a subcontracting clause violates section 8(e). *See, e.g., Feather v. United Mine Workers of Am.*, 711 F.2d 530 (3rd Cir. 1983) (affirming the trial court's finding that a clause violated section 8(e) of the NLRA, and affirming the trial court's finding that the union was exempt from antitrust liability under the non-statutory exemption). The NLRB finding addresses only the specific requirements of the NLRA, distinguishing union standards clauses from union signatory clauses, and does not address the antitrust analysis that underlies the labor exemption. Where the union's agreement suppresses competition only in wages, hours, and working conditions within a labor market, and preserves work for the employees that union represents, its effect on competition among employers is not a violation of the antitrust laws.

> **b.     In the Alternative, Claims 1-3 of the Amended Complaint Must Be Dismissed Because Defendants' Alleged Behavior Is Protected By The Established Statutory Labor Exemption to the Antitrust Acts.**

The statutory labor exemption to the antitrust laws rests on sections 6 and 20 of the Clayton Act, 15 U.S.C. § 17 and 29 U.S.C. § 52, and the Norris-LaGuardia Act, 29 U.S.C. §§ 104, 105, 113. *Connell*, 421 U.S. at 621-22. As noted above, as a general matter, the statutory exemption covers unilateral union action but not joint union/non-labor group actions. *See, e.g., Clarett v. National Football League*, 369 F.3d 124, 130 n.11 (2d Cir. 2004). This Court, however, has held that, while a union will forfeit the exemption if it conspires with non-labor groups to restrain trade, "a collective bargaining relationship, standing alone, does not constitute a conspiratorial combination with a non-labor group outside this exemption and will not support an antitrust claim." *Colfax Corp. v. Illinois State Toll Highway Auth.*, No. 93 C 7463, 1994 WL 444882, at *9 (N.D. Ill., Aug. 16, 1994), *aff'd*, 79 F.3d 631 (7th Cir. 1996), citing *Mid-America*, 675 F.2d at 885-86 & n.12.

Under the Seventh Circuit's analysis in *Mid-America*, "the central questions to be asked in determining whether [a] . . . complaint . . . alleged conduct not covered by the statutory labor exemption are whether the union acted in its own self-interest and whether a conspiracy between

the union and a non-labor entity was properly pleaded." *Mid-America*, 657 F.2d at 886.[4]  In this case, there is only one possible answer to these questions based on the allegations in the Complaint and the findings of the ALJ.  *First,* there can be no question that Local 1 "acted in its own self-interest."  *Second*, Wackenhut has not properly pleaded a conspiracy between Local 1 and a non-labor entity of the sort that removes the Sherman Act exemption.  The Defendants' conduct is thus squarely within the statutory exemption to the antitrust laws.  *See id*.

The Amended Complaint and the ALJ's findings foreclose any argument that Local 1's own actions were in anything but its own self-interest.  Activities are found to be in a union's self-interest if "'they bear a reasonable relationship to a legitimate union interest.'"  *Imperial Const. Mgmt. Corp. v. Laborers Int'l Union of N. Am. Local 96*, 729 F. Supp. 1199, 1211 (N.D. Ill. 1990), quoting *Allied Int'l Inc. v. International Longshoreman's Ass'n*, 640 F.2d 1368, 1380 (1st Cir. 1981), *aff'd,* 456 U.S. 212 (1982).  Specifically, "the labor exemption has been applied when the union acts to protect the wages, hours of employment, or other working conditions of its member-employees, objectives that are at the heart of national labor policy."  *Id.*  Here, the SSA collective bargaining agreement and its subcontracting clause required all employers doing security work in the downtown Chicago office building labor market to provide their security employees the standard wages and working conditions provided by the SSA.  Am. Compl. ¶ 3.  That requirement most certainly "bears a reasonable relationship to a legitimate union interest."  *Imperial Const. Mgmt. Corp.*, 729 F. Supp. at 1211;  *see Mid-America*, 675 F.2d at 886 (agreement to increase wages is "certainly a result that is in the union's interest"); *Oliver*, 358 U.S. at 294 (noting that unions "protect lawful employee interests" by fixing wages).

The Amended Complaint, moreover, comes nowhere close to properly pleading a conspiracy.  In *Mid America*, the Seventh Circuit held that, for purposes of applying the statutory exemption, five elements must be alleged for such a conspiracy to be properly pleaded.  675 F.2d at 888, citing *Pennington*, 381 U.S. at 664.  These five elements are:  "1) that the union must have agreed to impose upon other employers terms agreed to by it and a "non-labor" entity; 2)

---

[4]        This Court has also noted that *Mid-America* can be read "as holding simply that collective bargaining agreements concerning subjects of mandatory bargaining are insufficient to remove the statutory exemption without even reaching" the inquiry as to the conspiracy.  *Imperial Constr. Mgmt. Corp. v. Laborers Int'l Union of N. Am. Local 96*, 729 F. Supp. 1199, 1209 n.10 (N.D. Ill. 1990).  While Defendants certainly do not contest this reading of *Mid-America*, even if this court applies the more rigorous analysis outlined in *Mid-America*, the statutory exemption nevertheless applies.  *See, e.g., id.*

that the union activity must not be unilateral; 3) that the union activity must be at the behest of or 4) in combination with, a non-labor entity which occupies such a position in the competitive structure that it would directly benefit from the restraint; and 5) that the union and non-labor groups share an anti-competitive concerted purpose."  *Id.*; *see also Imperial Const.*, 729 F. Supp. at 1209-10.

Here, as in both *Mid-America* and *Imperial Construction*, nothing in the Amended Complaint meets either the third and fourth or the fifth requirement:  that BOMA, the non-labor entity, "occupies such a position in the competitive structure that it would directly benefit from the [alleged] restraint,"  or that Local 1 and BOMA "share an anti-competitive concerted purpose."  *Mid-America*, 675 F.2d at 889.[5]  As in those two cases: the "primary effect of [Local 1's] agreement [with BOMA] was on wage scales, and thus any benefit to non labor entities would be indirect," *id.* at 889; *Imperial Constr.*, 729 F. Supp. at 1209-1210; and the "only apparent benefit to union contractors of requiring that other contractors sign union subcontracting agreements would be the elimination of competition [among BOMA members] based on labor costs." *Imperial Constr.*, 729 F. Supp. at 1210.  Under *Mid-America*, the failure of Wackenhut's Amended Complaint to allege those two elements of the conspiracy test is fatal to the antitrust claims.

## II.    CLAIM 4 OF THE AMENDED COMPLAINT MUST BE DISMISSED FOR ITS FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AND FOR A LACK OF SUBJECT MATTER JURISDICTION.

As a general rule, unfair labor practice claims are within the exclusive jurisdiction of the NLRB.  *See Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83 (1982).  The primary exception to this rule is for suits brought under section 303 of the LMRA, 29 U.S.C. § 187, which grants the federal courts authority to hear damage suits brought for violations of section 8(b)(4) of the NLRA.  *Tri-Gen, Inc. v. International Union of Operating Eng'rs, Local 150*, 433 F.3d 1024, 1034 (7th Cir. 2006).  Given these principles, Claim 4 must be dismissed for two reasons.  *First,* section 303 of the LMRA does not grant any federal court subject matter jurisdiction over a claim for damages alleged to have been caused by a violation of section 8(e) of the NLRA, 29

---

[5]       Indeed, the fact that Wackenhut did not even name BOMA as a defendant in this action (despite having filed charges against BOMA in the NLRB proceeding) confirms that Wackenhut is not alleging that BOMA combined with Local 1 to accomplish any shared anticompetitive purpose.

U.S.C. § 158(e). *Second*, Wackenhut's conclusory allegation that Local 1 violated section 8(b)(4) of the NLRA is insufficient as a matter of law to state a cause of action under section 303.

**A.     This Court Does not Have Subject Matter Jurisdiction Over Damages Claims Under Section 8(e) of the NLRA**

The limited subject matter jurisdiction of federal courts does not authorize the court to adjudicate claims for damages under any provision of the NLRA other than section 8(b)(4). Thus Wackenhut's invocation of section 303 of the LMRA to support jurisdiction for its damages claim under section 8(e) of the NLRA fails at the threshold, because "[s]ection 303 provides a remedy *only* for violations of § 8(b)(4) of the Act." *Shepard v. NLRB*, 459 U.S. 344, 351 (1983) (emphasis added). *See also Tri-Gen*, 433 F.3d at 1035, 1037 ("Because federal court jurisdiction under 29 U.S.C. § 187 extends *only* to violations of section [8](b)(4)," the court lacks jurisdiction over other alleged violations of section 8(b).); *Brown & Root, Inc. v. Louisiana State AFL-CIO*, 10 F.3d 316, 321 n.4 (5th Cir. 1994) ("[S]ection 303, which allows parties to sue for damages in federal district court, appears to be limited to violations of section 8(b)(4) and not to extend to violations of section 8(e)."); *Atchison, T. & S. F. Ry. Co. v. Locals Nos. 70, 85, 315*, 511 F.2d 1193, 1195 (9th Cir. 1975) (declining to "broaden the scope" of LMRA § 303 to include claims of an 8(e) violation); *United Rental Highway Techs., Inc. v. Indiana Constructors, Inc.*, No. 1:05-CV-0571, 2006 WL 3391350, at *19 (S.D. Ind., Nov. 22, 2006) (finding that a contract clause, absent coercive or threatening behavior, does not constitute an unfair labor practice under 8(b)(4)), *aff'd*, 518 F.3d 526 (7th Cir. 2008); *Betal Envtl. Corp. v. Labor Union No. 78, Asbestos, Lead & Hazardous Waste*, 123 F. Supp. 2d 156, 161 (S.D.N.Y. 2000) ("[S]ection 303 does not extend district court jurisdiction to claims arising out of pure violations of section 8(e).").

Because federal courts, apart from section 303, do not have jurisdiction over activity which is subject to section 8 of the NLRA, "they 'must defer to the exclusive competence of the National Labor Relations Board.'" *Tri-Gen*, 433 F.3d at 1034. Applying this direct authority, there can be no question that this Court should, pursuant to Fed. R. Civ. P. 12(b)(1), dismiss Wackenhut's claim for damages under section 8(e).

**B.** **Wackenhut's Complaint Does Not State an Actionable Claim for a Violation of Section 8(b)(4) of the NLRA.**

Wackenhut cannot escape the jurisdictional limits of section 303 by its conclusory references to a violation of section 8(b)(4) of the Act.  *See* Am. Compl. ¶¶ 2, 57, 67, 72, 78.[6] The Amended Complaint wholly fails to allege facts that would constitute a violation of that section.

Section 8(b)(4)(A) and 8(b)(4)(B) of the NLRA state in their relevant parts:[7]

> It shall be an unfair labor practice for a labor organization or its agents—
>
> (4)(i) to engage in, or to induce . . . [others] to engage in, a strike . . . or (ii) to threaten, coerce, or restrain any person . . . in an industry affecting commerce, where in either case an object thereof is--
>
> > (A) forcing or requiring any employer . . . to enter into any agreement which is prohibited by [section 8(e)]; [or]
> >
> > (B) forcing or requiring any person . . . to cease doing business with any other person[.]

29 U.S.C. §§ 158(b)(4).  To invoke section 8(b)(4), and to establish this court's jurisdiction under section 303 of the LMRA, a plaintiff must allege that (1) a union engaged in a strike or other actual or threatened *coercive* conduct (2) that was designed to *force* a person to enter into an agreement prohibited by section 8(e) or to cease doing business with another.  *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Construction Trades Council*, 485 U.S. 568 (1988);  *Shepard*, 459 U.S. at 351 ("Section 303 provides a remedy only for violations of § 8(b)(4) of the Act, which, in turn, requires proof of coercion.").  *See NLRB v. Servette, Inc.*, 377 U.S. 46 (1964) (section 8(b)(4) is not violated by a union request for a person to cease doing business with another person).

---

[6]     For example, in ¶ 78 of the Amended Complaint, Wackenhut alleges that "[t]he conduct and activity of Local 1 herein violated Section 8(e) and 8(b)(4) of the NLRA, as amended, 29 U.S.C. §§ 158(e), 158(b)(4)."

[7]     While we have quoted the relevant portions of section 8(b)(4) here, we have attached this section in its entirety in Exhibit B.

All that the Amended Complaint alleges in this regard is that that "Defendant Local 1 . . . violated Sections 303 and 8(b)(4) of the NLRA . . . by engaging in a prohibited 8(e) 'hot cargo' agreement, inducing employers to enter into such unlawful agreement and restraining employers through the use of such agreement." Am. Compl. ¶ 5; *see also id.* ¶ 71 ("Through the 'hot cargo' agreement, Local 1 forced building owners and managers in the Chicago market . . . to subcontract only with Local 1 signatory services companies."). Nothing in the Amended Complaint alleges that Local 1 engaged in any coercive conduct to force or require BOMA to enter into the SSA subcontracting clause at issue here. Of equal moment, nothing in the Amended Complaint alleges that Local 1 engaged in any coercive conduct to force or require BOMA to cease doing business with any other person. *Compare Feather*, 711 F.2d at 537 (finding a violation of 8(b)(4)(B) resulting out of the union's coercive behavior to obtain and enforce a clause violating 8(e)).

## CONCLUSION

For the foregoing reasons[8], Defendants SEIU Local 1, Thomas Balanoff, Mona Ballenger, and Edward Bowen respectfully request that the Court grant their motion to dismiss Wackenhut's complaint in its entirety under Rules 12(b)(1) and 12(b)(6).

---

[8] While it is properly a matter to be raised in a motion for summary judgment (should any antitrust claims remain after this motion to dismiss), in addition to these fatal flaws, it appears that Wackenhut does not have the "antitrust standing" that it needs to bring this action. Notably, Wackenhut both (1) fails to allege that it suffered any harm proximately caused by the subcontracting clause (as it was directly bound by its own agreement with Local 1 to provide the same wages, hours, and working conditions that the SSA required for all but a few days of the 4-year limitations period); and (2) is not the proper party to claim injury for any alleged harm to consumers. *See generally Tri-Gen Incorporated v. Int'l Union of Operating Engineers, Local 150*, 433 F.3d 1024, 1031 (7th Cir. 2006).

Respectfully Submitted,


*/s/ Alexia Kulwiec*
ALEXIA M. KULWIEC
LESLIE J. WARD
STEVEN M. STEWART
SEIU Local No. 1
111 East Wacker Drive
Suite 2500
Chicago, IL 60601
(312) 233-8712


*/s/ Julia Penny Clark*
JULIA PENNY CLARK*
DANIEL A. ZIBEL*
Bredhoff & Kaiser PLLC
805 Fifteenth Street N.W.
Suite 1000
Washington, DC 20005
(202) 842-2600


*Counsel for Defendants SEIU Local 1, Thomas Balanoff, Mona Ballenger, and Edward Bowen*

* admitted *pro hac vice*

15

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of June, 2008, a copy of the foregoing
MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OF DEFENDANTS SEIU
LOCAL 1., THOMAS BALANOFF, MONA BALLENGER, AND EDWARD BOWEN was
filed electronically with the Clerk of the Court was served via the CM/ECF system upon all
counsel of record in this case.  Pursuant to Local Rule 5.2(e), a courtesy copy of this
memorandum will be delivered to the courtroom deputy's office in Room 2316-A of the Dirksen
Building.

/s/ *Julia Penny Clark*
Julia Penny Clark

# Exhibit A

JD–79–07
Chicago, IL

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES

BUILDING OWNERS & MANAGERS
ASSOCIATION OF CHICAGO
(BOMA/CHICAGO)
   Respondent

  and               Case No.  13-CE-127

THE WACKENHUT CORPORATION
   Charging Party

SERVICE EMPLOYEES INTERNATIONAL
UNION LOCAL NO. 1
   Party to the Contract

*Jeanette Schrand,* esq.,
 for the General Counsel
*Dennis Devaney, esq.,*
 of Bloomfield Hills, Michigan
 for the Charging Party
*Richard L. Marcus, esq., and Roger T. Brice, esq.,*
 of Chicago, Illinois, for the Respondent
*Alexia Kulwiec, esq., and Craig Becker, esq.,*
 of Chicago, Illinois, for the Party to the Contract

DECISION

Statement of the Case

  Eric M. Fine, Administrative Law Judge. This case was tried in Chicago, Illinois on June 11 and 12, 2007. The charge was filed on October 5, 2006, by The Wackenhut Corporation (Wackenhut) and the complaint issued on March 19, 2007.  The complaint, as amended at the hearing, alleges that BOMA/Chicago (BOMA) violated Section 8(e) of the Act by maintaining, entering into, and reaffirming a provision in its 2004 collective bargaining agreement with Service Employees International Union Local 1 (Local 1) concerning security employees requiring that any subcontractor that does not have a contract with Local 1 meet all the standards of BOMA's agreement with Local 1, thereby requiring BOMA employer members to agree not do business with another employer or person.  The complaint, as amended, also alleges that, at all times the referenced sub-contracting provision of the collective-bargaining agreement has been applied and intended to be applied by the parties to the agreement to require non-signatory contractors to observe and be bound by the agreements' requirements for payment of monies into the fringe benefit funds set forth in the agreement, and that by the maintenance, entering into, and reaffirming that provision BOMA has violated Section 8(e) of the Act.[1]

---

[1] The complaint was amended at the hearing to drop Local 1 as a Respondent, leaving its participation to the proceedings as a Party to the Contract.  As such, Local 1 was given full rights

Continued

On the entire record, including my observation of the demeanor of the witnesses, and after considering the briefs filed by the General Counsel, Wackenhut,[2] BOMA, and Local 1, I make the following[3]

5

Findings of Fact

I. Jurisdiction

10    BOMA is a voluntary trade association of employer members engaged in business as building owners and managers in Chicago, Illinois.  BOMA has represented certain of its employer members in the negotiation and execution of collective-bargaining agreements with various labor organizations including Local 1.  During the past 12 months, BOMA in conducting its business operations derived revenues in excess of $50,000 from employers that are engaged in
15    interstate commerce in that the employers received $50,000 in revenues directly from points outside the state of Illinois.  BOMA admits and I find that BOMA and its employer members are employers engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act and Local 1 is a labor organization within the meaning of Section 2(5) of the Act.

20    _____
of participation in this proceeding.  At the close of the hearing, on June 12, 2007, I allowed BOMA and Local 1, until July 9, 2007, to determine if any additional evidence was needed to respond to the General Counsel's amendment to the complaint pertaining to fringe benefit fund contributions.  By fax dated July 9, 2007, Local 1 filed a motion to present additional evidence.  Wackenhut filed an opposition to said motion on July 11, 2007.  A conference call was held between all parties on
25    July 11, 2007, concerning Local 1's motion and the opposition thereto.  On July 12, 1007, Local 1 filed a withdrawal of its motion to present additional evidence.  Accordingly, on July 12, 2007, I issued an email to the parties canceling a conference call then scheduled for July 13, 2007, and closing the record.

[2] Following the submission of briefs, BOMA filed a motion to strike certain portions of
30    Wackenhut's brief incorporated under the heading of "Background."  BOMA argues that none of the alleged facts contained therein, except for a few specified items, were supported by record evidence and that the facts asserted were in large part depicting actions between Wackenhut and SEIU.  BOMA also specifically denied the accuracy of a representation in Wackenhut's brief concerning a "Suburban Agreement."  Wackenhut filed a response to the motion to strike
35    asserting that the background section was general information to place issues and facts before the ALJ in context.  BOMA filed a response to Wackenhut's response reiterating its contention that referenced portions of Wackenhut's brief should be struck.  I do not find it is necessary to strike portions of Wackenhut's brief.  However, I have not relied on or considered any assertion of fact that was not part of the record in this case. See, *Baldwin Shop 'N Save,* 314 NLRB 114 fn. 1
40    (1994).  I have also rejected Wackenhut's request in its brief and response that I to take judicial notice of an alleged settlement agreement between Wackenhut and SEIU.  No attempt was made to place the settlement into evidence, there is no claim that BOMA was a party to or otherwise made aware of the settlement, and a settlement agreement is not akin to a published Board decision of which I would take judicial notice.

45    [3] In making the findings herein, I have considered all the witnesses' demeanor, the content of their testimony, and the inherent probabilities of the record as a whole.  In certain instances, I have credited some but not all of what a witness said. See *NLRB v. Universal Camera Corporation,* 179 F. 2d 749, 754 (C.A. 2), reversed on other grounds 340 U.S. 474 (1951).  All testimony has been considered, if certain aspects of a witness' testimony are not mentioned it is
50    because it was not credited, or cumulative of the credited evidence or testimony set forth above.  Further discussions of the witnesses' testimony and credibility are set forth throughout this decision.

II. Alleged Unfair Labor Practices

5      Ronald Vukas is the executive vice president of BOMA and he has held that position since
September 2001.  Vukas' testimony reveals that BOMA is a nonprofit association whose
membership is divided into four categories.  Commercial office building members of BOMA fall
into two of these categories, which are general office buildings and allied buildings such as the
Art Institute.  These two categories of buildings have voting rights in BOMA with one vote per
10    building.  Vukas testified that as of June 11, 2007, there were 260 buildings as BOMA members,
all located in Chicago.  Vukas testified that BOMA has two non-voting classifications of
membership called affiliate members.  One group of affiliate members provides goods and
services to office buildings in Chicago.  The other affiliate members, such as law firms and
architectural companies, provide professional services to the office buildings.  Vukas testified that
15    some of the security contracting firms are affiliate members.  Affiliate members can attend BOMA
committee meetings, but are not represented by BOMA for collective bargaining purposes.
Vukas testified BOMA provides advocacy services for its members such as dealing with city hall
in terms of building codes.  BOMA also provides members with educational services, research
and statistical information and collective bargaining representation.

20

       Louis Caravelli started the BOMA's security committee and he has been a committee
member since 1985.  The committee provides assistance to Chicago properties, educational
services to member buildings, and trains security personnel.  Caravelli testified the committee
currently has 50 members, including building personnel, representatives of security companies,
25    as well as a few police officers and federal agents.  The committee runs luncheons for BOMA
members and provides speakers on how to do things concerning security, such as hiring a
security director.  The committee has run programs for security training, and has worked with
Local 1 to bring security training for the officers.  The committee has been involved with the
Chicago Police Department, the FBI, Alcohol, Tobacco and Firearms, the Department of
30    Homeland Security, and other federal agencies.  Caravelli testified that a sub committee of the
committee drafted the Chicago Evacuation Ordinance, which was adopted by the city.  Caravelli
testified the committee has worked with the Chicago police to bring the security effort in the
downtown area of Chicago together to help reduce crime.  Caravelli testified they have also
worked with the fire department concerning evacuation response training.

35

       Richard Marcus, a licensed attorney, has represented BOMA since 1975 in labor relations
matters.  Marcus testified, "I have participated, I believe, in every collective bargaining session
conducted by, involving BOMA/Chicago since 1975."[4]  Marcus has represented BOMA in
negotiations with several different unions, including the SEIU.  Marcus testified that the SEIU has
40    represented security employees in BOMA member buildings since 1975 and before because prior
to 1975, SEIU had contracts dealing with elevator operators and starters, who Marcus
characterized as performing security functions.  Marcus testified he has seen a contract with a
predecessor union to SEIU and BOMA's predecessor dating back to 1918, covering elevator
operators, starters and assistant starters.

45    _____

       [4] Marcus testified that during the 2001 contract negotiations with Local 1 there was discussion
of the establishment of a training program for security officers.  Marcus testified that in 2004, the
outlines of a program were established and a trust was created, which is in the collective
bargaining agreement and funded by contributing employers.  Marcus testified this has created a
50    school for the training of security personnel in life safety, CPR, evacuation in the event of terrorist
acts, evacuation in the event of fire, or a disruption in the building.  The training is tailored to the
commercial building industry.  Attendance at the training is voluntary.

Marcus testified to the following: BOMA's predecessor's 1975 collective bargaining agreement with the SEIU covered elevator operators, elevator starters, assistant starters, and security employees.  The collective bargaining agreements remained that way until 1984 when the parties agreed to separate contracts for security and elevator employees.  Marcus testified that in negotiations in 1997 or 1998, BOMA, told the union that BOMA would no longer deal with them as a bargaining representative for elevator employees because elevator employees were performing security functions identical to that of the security employees, who were covered under a separate contract.  Eventually, the SEIU accepted the absorption of the elevator employees into the security bargaining unit.  Marcus testified it was BOMA's position that elevator starters, whose function it was to monitor the halls and the lobbies of the buildings had become purely security employees because by 1997 most of the passenger elevators were automated.  Most of the freight elevators had also been automated by that time.  However, they were still manned by elevator operators who controlled access to the buildings and screened out people who should not be there.  Marcus testified it was BOMA's position that is what security employees do and those employees should be included in the security unit.

Marcus identified a collective-bargaining agreement, with effective dates of September 29, 1975 through March 27, 1977, between the Building Managers Association (BMA) and SEIU local 25 (The 1975 agreement).[5]  Marcus testified that he negotiated this contract.  Marcus testified that this was the initial contract where elevator and security employees were combined into one unit.  The recognition provision of the agreement lists both elevator and security employees.  Article XXIV, Subcontracting, reads in pertinent part:

If any Employer shall, during the life of this Agreement, contract for all or any part of the work being performed by employees in the bargaining unit covered by this Agreement, he shall include in his Agreement with the contractor a provision binding the contractor to observe the economic terms and conditions of this Agreement, such as wages, hours and fringe benefits.  The Agreement between the Employer and the contractor shall also provide that on complaint filed by the Union that the contractor is not faithfully observing such terms of this Agreement, the Employer may terminate his Agreement with the contractor on thirty (30) days' notice.  On a complaint filed by the Union, the contractor shall be given a hearing before a representative of the Union and a representative of the Employer.  If they cannot agree on a disposition of the complaint, it shall be decided in accordance with Article XX hereof.  If it is determined that the complaint of the Union is well founded, the contract between the contractor and the Employer shall be terminated.

The March 29, 1982 to March 25, 1984, collective-bargaining agreement between BMA and Local 25, covered both elevator personnel and security employees.  By letter dated August 7, 1984, BMA sent its members a copy of a collective bargaining agreement with Local 25, which covered only the elevator operators and starters for the period of March 26, 1984 to September 28, 1986.  The members were advised that negotiations with Local 25 for a separate agreement for security personnel were ongoing.  An agreement was negotiated between BMA and Local 25 covering security personnel, with the effective dates of March 26, 1984 to January 25, 1987.  All three of these agreements contained the same subcontracting language included in the 1975 agreement set forth above.  Marcus testified that the 1984 contract was the first contract negotiated between BMA and SEIU just for security employees.  As set forth above, in the 1997

[5] Marcus testified BMA was the prior name for BOMA and that Local 25 was now Local 1 as Local 25 was dissolved following a trusteeship and incorporated into Local 1.  Marcus testified that he thought the first contract with Local 1 was the 1998 agreement.

or 1998 contract negotiations, a separate agreement for the elevator employees ended and they were merged into the security employees bargaining unit.  Marcus testified there was no time following the 1984 contract where there was not a contract between BOMA and SEIU for security
5   employees.

There were no collective bargaining agreements submitted into evidence covering the period between the expiration of the 1984 agreements and the start of the 2001 agreement between BOMA and Local 1.  The 2001 agreement has effective dates of April 23, 2001 to April
10   25, 2004.  Marcus testified there was a period when maintenance of economic standards language pertaining to subcontracting was not in the collective bargaining agreements.  Marcus explained that this took place when there was a jurisdictional fight between Local 1 and SEIU Local 73 pertaining to certain Chicago office buildings.  Marcus testified BOMA took the position with Local 1 that it would not bind its members to use contractors who are living up to Local 1's
15   wage scale when another SEIU local was putting contractors into buildings at a lower wage scale.  Marcus testified Local 73, "had lower wages and benefits."  Marcus testified that this could have started in 1987 and lasted for 8 or 9 years when the maintenance of economic standards language for contractors was not in BOMA's collective bargaining agreements with the SEIU.  Marcus testified that even during the period when there was no economic standards provision in
20   the BOMA contract for subcontractors some of the buildings on their own required the contractor to deal with Local 1.  He testified, "I saw some of them that specifically said that you must pay the rates and benefits that are contained in, or excuse me, you must deal with Local 1.  Some of the buildings have said that on their own."[6]

25   Kenneth Cliff has been working for Local 1 or its predecessors for about 33 years.  Cliff testified that in the 1990's, the all standards subcontracting clause was not in the contracts between BOMA and the SEIU.  Cliff testified that, during that time, Local 25 and then Local 1 continued to organize and represent security guards in down town Chicago who were employed by contractors.  Cliff testified the economic terms of the Union's contracts with contractors were
30   the same as the economic terms in BOMA's contracts.  Cliff testified that during the period when the clause was not in effect between BOMA and the Union, almost all of the guards in the downtown office buildings were represented by the Union.  Cliff testified that there was no diminution in the economic standards in the downtown area for security guards because the terms that applied were largely set by the BOMA contract.  Cliff testified that during this period,
35   the Union continued to demand the area standards clause regarding economic terms be put back in the BOMA contract.  Cliff testified the language was put back in the contract in the late 1990's.  Cliff testified that, although the language was not in the contract, the basis for the Union demanding that the BOMA subcontractors comply with the economic terms was that the area standards for downtown Chicago were always the BOMA standards going back to the 1930's.

40

---

[6] Marcus testified that he knows there is "a widespread practice in the city of Chicago in office buildings, and I have personally been involved in this where, regardless of the contractor, whether it's security, plumbing, electrical, anything, that before they enter into the contract they insist that
45   they will have union personnel.  And the reason they do that, is so that every, there won't be any threats of any work stoppage from anybody.  And those are buildings that don't even have contracts of any kind with the plumbers, with the pipe fitters, with whoever, it's just their practice that they want union people working in the buildings.  I know because when I moved into a building, I tried to have some carpeting installed, and they would not let them in the building
50   because they were non-union."  Marcus testified this incident had nothing to do with BOMA, rather the building owner as a matter of policy would only allow people who were union contractors to work in the building.

I did not find Cliff, an employee of Local 1's, testimony to be very convincing here given Marcus' testimony that BOMA refused to maintain the economic standards language in Local 25 or Local 1's contract because a competing SEIU Local was organizing the Chicago buildings at
5   lower rates.  Moreover, Cliff testified in generalities providing no specifics as the extent of Local 25 or Local 1's organization of the BOMA buildings or that of subcontract employees.  Marcus' testimony revealed that the maintenance of economic standards language was removed from the BOMA agreement around 1988, and Cliff testified that such language was not reinserted until the late 1990's.  Despite Cliff's contention that economic standards language was reinstated in
10  BOMA and Local 1's contract in the late 1990's, no agreement containing such language was entered into evidence for the period covering 1988 to 2001.

The recognition clause of the April 23, 2001 through April 25, 2004, agreement between BOMA and Local 1 states Local 1, is the representative of "security employees, including elevator
15  operators, starters and assistant starters employed by them in the buildings which are now or may hereafter be covered by this Agreement…".  The subcontracting clause, Article XXIII contains the following language, "any subcontractor that does not have a collective bargaining agreement with the Union, the Employer shall require that said contractor will meet all of the standards of this Agreement."  The subcontract Article also states that, "In the event that the
20  Employer subcontracts to a security contractor which is a party to a collective bargaining agreement with the Union, the terms and conditions of this Agreement shall be the only terms and conditions applicable to said contractor and its employees working in the Employer's buildings notwithstanding the particular terms and conditions contained in any collective bargaining agreement between the Union and such security contractor."  Article XXIII in the 2001 BOMA
25  Local 1 agreement did not reference the agreement's grievance-arbitration procedure.  In fact, Article XVIII, Section 6 of the grievance arbitration procedure states, "The grievance procedure set forth in this Article shall not apply to differences or disputes involving employees of contractors engaged by the Employer pursuant to Article XXIII which are subject to resolution under grievance procedures established by and between the contractor and the Union."
30

Mona Ballenger, security director for Local 1, has worked there since December 2000. Ballenger testified Local 1 sought to enforce the subcontracting all standards provision in Article XXIII, in 2003, in that on one occasion Local 1 sought to enforce the economic terms and conditions of the article pertaining to a subcontractor.  Ballenger testified that a grievance was
35  filed at the time, and it was Local 1's position that the economic terms and conditions pertaining to Article XXIII "means all the economics, the wage rates, the health and welfare, the pension – " and vacations.  She explained that included payments to those SEIU funds contained in the contract and vacation benefits.  Ballenger testified that there had been one contractor performing security work in BOMA buildings that was not signatory to a contract with Local 1.  She testified it
40  was Local 1's position that the subcontractor had to make payments, "to the union's funds and the economic terms, or benefit levels to the security officers."  Ballenger testified as follows pertaining to the non union sub contractor's failure to make contractual benefit fund contributions under BOMA's contract with Local 1:

45       Q. So they tried to make the contributions and you wouldn't let them?
        A. No.
        Q. No, you wouldn't let them, or no, I'm incorrect.
        A. No, they didn't even try to.
        Q. Okay. So they weren't doing it.
50       A. Correct.
        Q. And you filed a grievance to make them to do that?
        A. We filed a grievance to BOMA to make them do that.

Ballenger testified the grievance was filed against BOMA because it was a non-signatory contractor, so they could not make those contributions to the SEIU funds.  Ballenger testified Local 1 filed a grievance against BOMA to make the contractor make the funds contributions.  She testified, "it went to the grievance hearing with BOMA."  She testified there was a meeting held between the building manager, SEIU, and BOMA.  Ballenger testified that, as a result, the BOMA member employer operating the building put the security contract out for bid, obtained a union contractor, and replaced the non union contractor that had been servicing the building.  Ballenger testified that when the non union contractor refused to make contributions to the SEIU funds Local 1 filed a grievance.  Ballenger testified the employer got rid of the contractor, "Because they were a BOMA signatory building and they were bound by the BOMA agreement with Local 1."  Ballenger testified that if the Article XXIII language was the same in the current contract as that which was contained in the contract in effect in 2003 then her interpretation of that language would be the same for the current agreement.  Under questioning by Marcus, Ballenger testified she was positive the 2003 grievance went to the labor management committee.[7]

The recognition clause of the BOMA and Local 1 agreement with dates of April 26, 2004, to April 29, 2007, contained the same language set forth above contained in the 2001 agreement.  The 2004 agreement required health and welfare and pension fund contributions for the full time covered employees.  Like in 2001, Article XXIII-Subcontracting in 2004 includes the following language, "any subcontractor that does not have a collective bargaining agreement with the Union, the Employer shall require that said contractor will meet all of the standards of this Agreement."  As in 2001, Article XXIII in 2004 states that, "In the event that the Employer subcontracts to a security contractor which is a party to a collective bargaining agreement with the Union, the terms and conditions of this Agreement shall be the only terms and conditions applicable to said contractor and its employees working in the Employer's buildings notwithstanding the particular terms and conditions contained in any collective bargaining

---

[7] Marcus testified he believed that he attended every labor management committee meeting in 2003.  He testified that, "I don't believe it's possible" that a meeting took place where he was not in attendance.  Marcus testified he did not recall a grievance being presented to the committee involving a contractor who allegedly was not meeting the economic standards in 2003 or at any other time.  Marcus testified there was never a decision by the BOMA labor management committee, or BOMA itself that a building contractor be replaced if they would not pay into the union pension fund.  Considering the demeanor of the witnesses and the content of their testimony, I have credited Ballenger's testimony over Marcus and find that Local 1 did file a grievance against BOMA because a non-union contractor was working in one of the buildings and failing to make contractual funds payments and that the grievance was brought before the labor management committee resulting in the contractor being removed from the building and being replaced with a union contractor.  Ballenger's testimony was clear and with good recall and it was against the interest of Local 1, her employer.  On the other hand, Marcus was testifying as an advocate for BOMA's position in this proceeding, and he could only testify that he believed he was at every labor management committee meeting in 2003, and that he did not believe it was possible that he did not attend one.  Moreover, the 2004 agreement was strengthened over the terms of 2001, in terms of accessibility of Local 1 to the contractual grievance procedure to enforce the all standards provision against contractors, and the remedies involved.  The new remedies were consonant with what took place in the 2003 grievance settlement leading me to the conclusion that Marcus was more aware of what transpired during the 2003 grievance than he was willing to admit since he represented BOMA during contract negotiations.  In any event, Ballenger's testimony, considering her demeanor and recall, was credible concerning the 2003 grievance, and I have credited it in full.

agreement between the Union and such security contractor."  However, the 2004 version of Article XXIII was changed from the 2001 agreement and now read, in pertinent part, that:

5
    Grievances alleging that a contractor is not faithfully observing the terms of this Agreement shall be processed in accordance with the grievance and arbitration procedures set forth in Article XVIII.  If it is determined by the Committee in the third step or in subsequent arbitration proceedings between the Union and the contractor that the grievance is well founded and the contractor thereafter refuses to implement the remedy
10
    imposed, the contract between the contractor and the Employer shall be terminated within sixty (60) calendar days after written notice by the Union to the Employer.

The grievance procedure was also changed in the 2004 agreement, deleting Section 6 referenced above, and specifically allowing grievance and arbitration proceedings against
15
contractors.

    Marcus testified contractors who have employees working in BOMA buildings regularly participate in the BOMA grievance procedure.  Marcus testified that as of 2004 and thereafter, there were two members each designated by BOMA and Local 1, who sit on the labor
20
management committee, which meets at the third step of the grievance procedure.  Marcus testified that during the 2004 contract there were between 35 and 40 grievances involving security personnel that made it to the labor management committee and that, "every single contractor who participated in those, in that procedure had a collective bargaining agreement of it's own with the SEIU."  Marcus testified that according to the BOMA agreement, if the contractor
25
is a signatory to an agreement with Local 1, and they are working as a contractor in a BOMA signatory building the collective-bargaining agreement that BOMA has negotiated prevails over whatever differences there are between that contract and the contractor's own contract with Local 1.  Marcus testified the grievance procedure established under the BOMA agreement supplants the grievance procedure in the contractor's agreement.  Marcus testified that while some security
30
contractors are affiliate members of BOMA they are not represented by BOMA at the bargaining table with Local 1.

    On September 13, 2006, BOMA distributed to BOMA employer members as well as to security contractors who work in BOMA buildings a BOMA labor relations manual that contained
35
the following provision:

    If the subcontractor is not a party to an agreement with the Union, building shall require contractor to meet all of the stands of the BOMA/CHICAGO-SEIU, Local 1 Security Agreement.
40
    Ballenger identified a contract Local 1 had with Wackenhut with effective dates of April 26, 2004, to April 29, 2007.  She testified the contract was no longer in effect at the time of the hearing taking place on June 11 and 12, 2007, although Wackenhut was still working in BOMA buildings.[8]   The Wackenhut contract contains the following provision:
45
    If there is any conflict between the BOMA/SEIU Local 1 Security Collective Bargaining Agreement and this Agreement in BOMA Security Signatory Buildings, the parties to this Agreement agree that the BOMA/SEIU Local 1 Security Collective Bargaining Agreement

_____

50
    [8] Ballenger testified the first page of the agreement was not the original first page.  She explained the page was added by the union and a letter was sent to each contractor clarifying the page.  Ballenger testified Wackenhut never issued an objection to the new first page.

shall govern and agree to be bound by the terms and conditions of the BOMA/SEIU Local 1 Security Collective Bargaining Agreement.

5     The Agreement Local 1 had with Wackenhut contained Article XXIV, Subcontracting allowing Wackenhut to subcontract work under certain conditions, including that Wackenhut "require that said contractor will meet all of the standards of this Agreement." It also stated that, "In the event that the employer subcontracts to a security contractor which is a party to a collective bargaining agreement with the Union, the terms and conditions of this Agreement shall be the only terms and

10   conditions applicable to said contractor and its employees working in the Employer's building notwithstanding the particular terms and conditions contained in any collective bargaining agreement between the Union and such security contractor." It goes on to state that "Grievances alleging that a subcontractor is not faithfully observing the terms of this Agreement shall be processed in accordance with the grievance and arbitration procedures set forth in Article XIX. If

15   it is determined in the proceedings that the grievance is well founded and the subcontractor thereafter refuses to implement the remedy imposed, the contract between the subcontractor and the Employer shall be terminated within (60) calendar days after written notice by the Union to the Employer." Ballenger testified that all 25 contractors performing security work in BOMA buildings, with the exception of Wackenhut, were currently signatory to an agreement with Local 1 similar to

20   the one Wackenhut had signed.

Ballenger testified she was familiar with the clause at issue in this proceeding, the all standards clause, and that Local 1 took action to enforce the clause against Wackenhut. She testified that Local 1 filed a grievance against a BOMA building using Wackenhut and that "That's

25   just been done this week."[9]

Marcus testified that since he has been associated with BOMA, written communications are sent to all BOMA building members advising them of upcoming negotiations for a new labor

30   _____

[9] Ballenger testified to a grievance meeting that Wackenhut attended in which she testified that Dennis Devaney, counsel for Wackenhut objected to the grievance going forward. She also testified in response to a leading question from BOMA's counsel that the grievance took place at a time Wackenhut was signatory to the contract. It is unclear from Ballenger's testimony as to whether this grievance was the same one which Local 1 filed during the week of the hearing to

35   enforce the all standards clause against Wackenhut. Whether or not it was the same grievance, I have credited her testimony, as set forth above, that Local 1 filed a grievance against the BOMA building using Wackenhut during the week of the hearing, at a time when Wackenhut was no longer signatory to Local 's contract, and that the purpose of the grievance was to enforce the all standards clause against Wackenhut. Ballenger's testimony was clear on this point concerning

40   a recent event. I did not find her willingness to change that testimony pursuant to a leading question from Marcus, whose client was an ally of Local 1's in this proceeding, sufficient to undercut Ballenger's otherwise clear and credible testimony about an event that just happened. I find Ballenger's testimony undercuts Marcus' testimony that BOMA and Local 1, extended BOMA's and Local's 2004 agreement by written agreement through June 15, 2007, but in the

45   extensions the parties modified the agreement by the deletion of the all standards clause. Similarly, I do not credit Ballenger's testimony that Local 1 has taken no action to enforce any terms of Article XXIII Subcontracting of the BOMA agreement since September 2006. While Marcus testified that there was a written agreement between Local 1 and BOMA that the all standards provision was no longer in effect, no such agreement was placed into evidence.

50   Second, Ballenger credibly testified that Local 1 had filed a grievance to enforce the all standards provision against a BOMA building for using Wackenhut, and that said grievance was filed during the week of the hearing, which took place on June 11 and 12, 2007

agreement.  Along with that notification, members are sent a sign up form whereby the building authorizes BOMA to negotiate that particular contract on their behalf.  BOMA's advises the union at the commencement of negotiations which buildings BOMA is representing in that negotiation.
5     BOMA also sends out requests for information to the buildings to prepare for negotiations.  The buildings are asked how many employees they have that are directly employed, and how many employees are working in the building that are employees of contractors.

      Marcus identified a summary that was provided to BOMA's labor committee prior to or
10    during the negotiations for the 1984 agreement with Local 25 covering security employees. Marcus testified the summary shows there were 34 buildings covered by the agreement, that 31 buildings had in house security crews, and 3 buildings had both in house and contract employees.  The summary showed there were 200 persons working for in house crews, which consisted of people employed directly by the owner or by the building management firm that was
15    managing the building and there were six security employees working for contractors in the buildings.[10]

      The summary compiled by BOMA from the building members for the 2001 contract negotiations with Local 1 shows that there were 139 signatory buildings for the 2001 agreement.
20    The summary shows that for the 2001 negotiations there were 310 security personnel employed directly by the buildings working in 45 buildings and there 900 individuals working for contractors working in 106 buildings.[11]

      The summary of information gathered by BOMA for the negotiation of the 2004 contract
25    showed there were 165 buildings signatory to that contract.  The summary shows that for the 2004 agreement there were 38 buildings directly employing 294 security personnel, and that there were 128 buildings using 1196.5 contractor employees as security personnel.

      Ballenger testified there is no difference between the duties of the security officers
30    working for the buildings and those officers working for contractors.  Ballenger testified that, at the time of the hearing in June 2007, Local 1 represented about 500 security officers that work directly for the buildings, and about 1500 who work for contractors.

_____

35        [10] Marcus testified that those individuals covered by the 1984 elevator operator and starters agreement were employed 100 percent by the buildings, and that after 1984, the elevator operators and starters to his knowledge were always employed by the building.
          [11] Marcus testified the circumstances varied at buildings covered by the 2001 summary.  He testified as an example the building at 120 South LaSalle Street shows two in house staff and
40    seven contract employees.  However, Marcus testified he was aware that the contractor in that building was a wholly owned subsidiary of the building owner, that they had common management and "common everything".  Marcus testified the Lurie Company owned the building, at 120 South LaSalle Street, and operated the buildings at 33 North LaSalle and the Garland Building, in the same fashion as they were also Lurie buildings.  Marcus testified that the Lurie
45    company was an exception the general rule, in that most BOMA buildings that contract out security work do not contract the work to their subsidiaries, rather the work is contracted to independent companies.  Marcus testified the building known as the Merchandise Mart showed 31 directly employed security staff, with no contract employees.  However, Marcus testified Merchandise Mart did use contract employees on an as needed basis and that might
50    vary from day to day.  Marcus testified the contract employees worked side by side with the building staff employees and that "those people are engaged at the same rates of pay and benefits."

Louis Caravelli has been employed, since October 2001, by Jones, Lang, and LaSalle (JLL), a commercial real estate management firm.  Caravelli has been the director of security and life safety at a building known as One Financial Place since 2001, which is managed by JLL.  The building is 40 stories; and it houses, among its tenants, the Chicago stock exchange.  Caravelli was employed by Lurie Company from 1981 to 2000 as corporate director of security and lifesaving.  While Caravelli was there, Lurie owned and operated three to four commercial buildings in Chicago, and there were other buildings that Lurie had partnerships in.  While working for Lurie Company, Caravelli also worked for some of its wholly owned subsidiaries, including LaSalle Security Systems from around 1984 to 2000 and Urban Security and Design Specialists.

Caravelli testified there are currently 22 security officers at One Financial Place, including one site supervisor, six supervisors, and 16 security officers.  Caravelli testified that at One Financial Place everyone on the security staff, except for Caravelli, is employed by a contractor, which is Argus Security Services.  Caravelli testified he has been involved in the contractor's hiring process of security employees.  He testified there is a standard that applicants have to meet before they are sent to him, and then he interviews them and gives them a pass or fail.  Caravelli testified the security officers at One Financial Place are represented by Local 1 and they were being paid the wages and the benefits provided in Local 1's contract.  Caravelli testified the building is a BOMA signatory.  Caravelli testified there were some non-supervisory security personnel receiving higher wages than the contractual rate, which was a minimum rate.  Caravelli testified the building determines how much the officers are to be paid.  He testified the building tells the contractor they have to pay them the minimum and that "depending on what the position is and how the officer is doing we will tell them that we want to give this person a raise and bring them up."  Caravelli testified that he imagines that Argus could disagree with the building's recommendation but did not think that Argus would since the building pays the increase.

Caravelli testified if an employee filed a grievance it would be between the employee and Argus, although Caravelli might be called to testify.  Caravelli has been involved with Argus promoting someone to supervisor.  He testified it is a joint process.  There is a weekly meeting with Argus, their site supervisor, and Caravelli where, if there is a vacancy for a supervisor, they try to identify the person they think should be given that position, or if they do not feel they have someone on staff then they find someone from outside.  Caravelli recommended a person for supervisor who was rejected by Argus because the person had a disciplinary history Caravelli was not aware of.

As security director, Caravelli has provided training to all of the security officers Argus provides to the building at One Financial place.  Caravelli testified that at times he has also had to change the security procedures in the building and communicate those changes to the officers in the building.  Caravelli testified he interacts with the officers working in the building on a daily basis, and he observes their performance, and he would talk to them if there is a problem with their performance.  He testified that if the defect was not corrected, "We would start a disciplinary procedure if that would be necessary."  Caravelli testified that Argus is the ultimate decision maker as to whether an employee is to be disciplined when Caravelli thinks the employee has done something wrong.[12]

---

[12] Caravelli identified a list of 13 buildings in the Chicago area, which he testified were managed by JLL.  He testified he was familiar with the security activities at some of the buildings, but he did not testify as to how any were operated in terms of security.

Caravelli testified that, when he started working for Lorie in 1981, there were three buildings, and about 18 to 20 security employees between the three properties. Caravelli left Lorie in March 2000 there were over 20 security personnel. Caravelli testified that in 1981 the
5  security officers were employed directly by the Lurie Company. He testified that through attrition they started obtaining officers from a contract firm until 1985, and then the contract firm LaSalle Security Systems, which Caravelli ran, provided the officers. Caravelli testified that when he worked for Lurie Company they supplemented their regular security work force with outside contractors. They did this when people went on vacation, when someone was sick, and in similar
10  circumstances to fill in spots. He testified that the contractor employees from 1985 to 2000 were LaSalle Security System employees but that there were still direct Lurie employees involved during that time.

*A. Analysis*

15

The complaint allegations in this case are pinioned on two theories by the General Counsel. One is that the all standards subcontracting clause has been and continues to be interpreted by the BOMA and Local 1 as an unlawful union signatory clause. The second is that although the all standards clause is ambiguous and therefore not unlawful on its face, it is
20  nevertheless unlawful in this instance because the work covered by the subcontract provision was not fairly claimable work for Local 1's bargaining unit under its agreement with BOMA.

1. The all standards clause as applied by BOMA and Local 1
is an unlawful union signatory clause

25

In *Chicago Dining Room Employees,* 248 NLRB 604, 606 (1980), the Board held that "It is well settled that contract clauses which purport to limit leasing or subcontracting to employers who are signatories to union contracts, so called union signatory clauses, are proscribed by Section 8(e)." In *General Teamsters, Local 982,* 181 NLRB 515, 517 (1970), affd. 450 F.2d 1322
30  (D.C. Cir. 1971), the Board set forth the following principles in determining whether a clause is violative of Section 8(e) of the Act:

if the meaning of the clause is clear, the Board will determine forthwith its validity under 8(e); and where the clause is not clearly unlawful on its face, the Board will interpret it to
35  require no more than what is allowed by law. On the other hand, if the clause is ambiguous, the Board will not presume unlawfulness, but will consider extrinsic evidence to determine whether the clause was intended to be administered in a lawful or unlawful manner.[13]

---

40  [13] Counsel for the General Counsel argues in her brief that the all standards language in the contract provision at issue here is ambiguous in that it fails to specify what standards must be met by the subcontract, and that it is plausible from the text to read it and conclude that it lawfully applies to only economic standards. Counsel for the General Counsel took a similar position in her opening argument at the hearing (Tr. 24-26). However, counsel for the General Counsel
45  argues that testimony of Ballenger constitutes extrinsic evidence clarifying the purpose of the all standards clause and that it is in fact an unlawful union signatory clause. Contrary, to the General Counsel, the charging party took the position at the hearing (Tr. 30), and in its post-hearing brief that the all standards language is not ambiguous, that it is clear and unlawful on its face, without the need to resort to extrinsic evidence. However, the Board stated in *Nott*
50  *Company, Equipment Division,* 345 NLRB 396, 398 fn. 10 (2005), "It is well established, however, that the General Counsel's theory of the case is controlling, and that a charging party cannot enlarge upon or change the General Counsel's theory. *Zurn/N.E.P.C.O.,* 329 NLRB 484 (1999),
Continued

In *Teamsters Local 277(J & J Farms Creamery),* 335 NLRB 1031 (2001), the Board majority found that an arbitration award reaffirming or interpreting a contractual article requiring an employer to subcontract work only to an employer signatory to a collective-bargaining agreement with the respondent union was violative of Section 8(e) of the Act.  See also*, Sheetmetal Workers Local 27,* 321 NLRB 540 (1996), where a joint board's adoption of a respondent union's grievance position as to an unlawful interpretation of a facially valid subcontracting clause was found to provide the requisite agreement for a finding of a Section 8(e) violation.  In *Laborers Local 29 (Blasters, Drillrunners & Minors Union),* 344 NLRB No. 90, slip op. at 1 fn. 1 (2005), the Board found a collective-bargaining agreement provision requiring other business entities to "be responsible for compliance with all the terms and conditions of the Agreement" to be violative of Section 8(e) of the Act.  In *Building & Construction Trades Council v. NLRB,* 328 F. 2d 540 (D.C. Cir. 1964), attempts to enforce a contract clause was found unlawful where it required compliance with the "terms of this Agreement."  In *Loc. 437, Int'l Brotherhood of Electrical Workers, AFL-CIO,* 180 NLRB 420, 421 (1969), a clause requiring compliance "with the terms of this Agreement" was held to be violative of Section 8(e) because it permits subcontracting only to employers who recognize the Union since it was found that the term complying with terms of the agreement covers union recognition as well as other terms of the agreement.  The Board stated therein, "if a subcontracting clause should require the subcontractor to adhere not only to the contract wage and hours terms, but also to such contract working conditions as seniority and grievance procedure, it would be an unlawful secondary clause.

Both BOMA and Local 1 have interjected a Section 10(b) defense to the complaint by claiming that the Wackenhut's charge is untimely and therefore the complaint must be dismissed. In *Dan McKinney Co.,* 137 NLRB 649, 653-654 (1962), the Board found that the contractual clause at issue was an unlawful hot cargo clause and stated as follows:

> We disagree with the Trial Examiner's conclusion that Section 8(e), by the words "to enter into," was intended to define as an unfair labor practice only the initial execution of a proscribed agreement. We have already considered similar contentions and have rejected this restrictive interpretation of Section 8(e). Such a construction would so narrow the meaning of the words "to enter into" as to recreate one of the loopholes which Congress obviously intended to close. For, Congress sought to free neutral employers from the inhibitions of a prior contractual commitment at all times, not just at the time of signing the contract and the 6-month period following. Congress could therefore not have intended to

citing *Kimtruss Corp.,* 305 NLRB 710 (1991)."  The charging party cites in its brief several cases for the proposition that a violation can be found for matters fully litigated regardless of whether they are set forth in the complaint.  I do not find those cases to be applicable here, nor do I find the facial validity of the all standards clause to have been fully litigated in view of the General Counsel's announcement at the hearing that the facial validity of the clause was not at issue.  I am convinced that BOMA and Local 1 would have at a minimum briefed the matter differently had they not been advised that the General Counsel's theory was limited in such a manner. See, *Teamsters Local 282 (E.G. Clemente Contracting),* 335 NLRB 1253, 1254 (2001).  Accordingly, I have not addressed the facially validity of the clause herein, although I have found with the reliance upon extrinsic evidence that the all standards clause is an unlawful union signatory clause.  Similarly, I reject the charging party's contention, first raised in its brief, that Local 1 cannot have a work preservation claim to the work because its membership includes both guards and non-guards.  This argument is not part of the General Counsel's theory of the case, nor was it fully litigated.

leave a gap, whereby contracts which are rendered void and unenforceable as between the parties, would, in effect, continue as if they were lawful agreements upon which findings of unfair labor practices could not be based simply because they were executed more than 6 months prior to the filing of the charge. The effect of the Trial Examiner's rationale would be to thwart the intent of Congress in enacting Section 8(e).

   In cases previously decided we have indicated our belief that the words "to enter into" must be interpreted broadly and encompass the concepts of reaffirmation, maintenance, or giving effect to any agreement which is within the scope of Section 8(e). For the reasons set forth in the cited cases and those discussed below, we are convinced that such an interpretation is correct. However, in those cases our ultimate finding that a violation of Section 8(e) had occurred was based on the fact that both the contracting union and the employer had taken some action by which both had acknowledged and reaffirmed the current effectiveness and application of the hot cargo clause in their contract and we held they had thereby "entered into" a hot cargo agreement. The instant situation presents a question we have not previously considered--whether a violation of Section 8(e) has occurred where the evidence establishes only that the employer took action implementing the contract during the period covered by the charge. We believe and find that this question must be answered in the affirmative and that the Respondent's action herein is within the prohibition and constitutes a violation of that section of the Act.. (Footnotes and citations omitted.)

   In *Chicago Dining Room Employees,* 248 NLRB 604 (1980), a union entered in a collective bargaining agreement with an employer association containing an unlawful union signatory clause outside the 10(b) period.  The Board stated that the Board has held that "the maintenance, enforcement, and reaffirmation of such an agreement within the 10(b) period constitutes an 'entering into' within the meaning of Section 8(e) of the Act." id at 606.  The Board held that the respondent union by demanding compliance with the agreement and instituting suit in order to compel compliance reaffirmed the agreement within the 10(b) period.  See also, *District Council of Carpenters,* 243 NLRB 416, 418 (1979), holding that where a party enforces a such a clause or requests adherence to its provisions, its conduct satisfies the 'enter into' language of Section 8(e) of the Act in terms of whether a charge is timely under Section 10(b) of the Act.  There a charge was deemed to be timely filed when an employer association admitted in its answer that it intended to give effect to the disputed provision until ordered by the Board or a court not to do so, and the respondent union had sent out letters to the respondent employer association notifying the association of its members who subcontracted work to non signatory subcontractors citing the article at issue within the 10(b) period.  See also, *Milk Drivers & Dairy Employees, Local Union 537,* 147 NLRB 230, 231 fn. 3, where the Board held, "We agree with the Trial Examiner that a violation of Section 8(e) is established when a respondent, whether an employer or a union, 'enters into' an agreement unlawful under that section, by insisting on its enforcement within the Section 10(b) period."  In *Heartland Industrial Partners,* 348 NLRB No. 72 (2006), the Board found that a Section 8(e) complaint was not time-barred although the charge did not cite a reaffirmation of the underlying contractual provision that took place with the Section 10(b) period.  Noting that the charge was timely with respect to a reaffirmation of the disputed provision within the 10(b) period, the Board concluded that the union and employer there were not prejudiced by the complaints reference to a reaffirmation of the disputed agreement that was not encompassed by the charge.

   In *Carrier Air Conditioning Co., v. NLRB,* 547 F.2d 1178, 1185-6, and 1186 fn. 8 (2nd Cir. 1976), cert. denied 431 U.S. 974 (1977), the court stated as follows:

      Our analysis regarding the congressional purpose underlying s 8(e) also helps to explain why the s 8(e) charge is not barred by s 10(b) of the Act, 29 U.S.C. s 160(b),

which establishes a six-month limitation period between the occurrence of an unfair labor practice and the filing of a charge with the NLRB. (FN7) The statute proscribes only "enter(ing) into" certain agreements, and, if this language were taken to mean that only the signing were prohibited, the six-month period would have passed here long before Carrier filed an unfair labor practice charge. The "enter into" language of s 8(e) has not been so construed, however. Instead, this court and others, as well as the NLRB, have held that a union may "reaffirm" an agreement, and thus, in effect, "re-enter" into it, by seeking to enforce it, at least when the enforcement effort itself appears to have a secondary objective. *Danielson v. International Organization of Masters, Mates & Pilots,* 521 F.2d 747, 754 (2d Cir. 1975); *NLRB v. Local 28, Sheet Metal Workers,* 380 F. 2d 827, 839-30 (2d Cir. 1967); *Los Angeles Mailers Union No. 9 v. NLRB,* 114 U.S. App. D.C. 72, 311 F.2d 121, 123 (1962) ("To seek to give it life is in substance to seek to have it agreed to, which is no different in substance from seeking to have it entered into"); *Bricklayers & Stone Mason Local 2 (Associated General Contractors),* 224 NLRB No. 132, slip op. at 11-13 (1976). See also *NLRB v. International Brotherhood of Electrical Workers,* 405 F. 2d 159, 164 (9th Cir. 1968) (construing "enter into" language of s 8(b)(4) ), cert. denied, 395 U.S. 921, 89 S.Ct. 1772, 23 L.Ed. 2d 237 (1969); *NLRB v. Milk Wagon Drivers Local 753,* 335 F.2d 326, 329 (7th Cir. 1964) (same). Because we conclude, as discussed below, that Local 28's contract enforcement efforts here had a secondary objective, we hold that the s 10(b) limitation period does not bar a finding that s 8(e) has been violated in this case. Moreover, once the possibility of a violation within the six-month period is recognized, "earlier events may be utilized to shed light on the true character of matters occurring within the limitations period ... ." *Local 1424, International Association of Machinists v. NLRB,* 362 U.S. 411, 416, 80 S.Ct. 822, 826, 4 L.Ed. 832 (1960) Harlan J.) (Harlan, J.). (FN 8)[14]

* * *

The Board also argues here that the 'enter into' language of section 8(e) requires a showing of a 'bilateral agreement, 'where as in the instant case the Union acted unilaterally. ….if addressed to the fact that only the Union really cared about enforcing the no subcontracting clause, the argument proves too much, since this must be true of all 'hot cargo' agreements. If addressed to a situation in which an employer signs an agreement and then is reluctant to comply with it, the argument is simply wrong as to both the facts and the law. The signatory Association here joined with the Union in April, 1973, in rejecting, through the Joint Adjustment Board (on which they had equal representation), a proposal to modify the agreement to allow the introduction of Modulines in New York. Moreover, in connection with the Babies Hospital job, General, a member of the Association, acquiesced in the Union's interpretation of the agreement to the extent of paying the full sum requested by the Union in March, 1975; while Carrier reimbursed

---

[14] The Board has likewise long held that events prior to the 6 months' statute of limitations may be used as background to shed light on a respondent's motivation for conduct within the 10(b) period. See *Grimmway Farms,* 314 NLRB 73, 74 (1994), enf. denied in part on other grounds 85 F.3d 637 (9th Cir. 1996) (where the Board considered a work stoppage outside the 10(b) period as background evidence for a respondent's refusal to rehire employees); and *Douglas Aircraft Co.,* 307 NLRB 536 fn. 2 (1991) enfd. 66 F.3d 336 (9th Cir. 1994) (where it was held that discipline outside the 10(b) period could be considered as evidence of animus to evaluate a discharge within the 10(b) period.). Similarly, statements occurring outside the 10(b) period may be used as evidence to shed light on a respondent's conduct within the 10(b) period. See, *Wilmington Fabricators, Inc.,* 332 NLRB 57, 58 fn. 6 (2000); and *Kaumograph Corp.,* 316 NLRB 793, 794 (1995).

General, it did so only because General refused to proceed with installation of the
Modulines until the grievance was settled.  To the extent that an interpretation of an
agreement is reflected in actions, therefore, it seems clear that the anti-Moduline
interpretation here was bilateral one.  Finally, even if no acquiescence at all by the sheet
metal contractors could be found, this fact would not affect the agreement's validity under
s 8(e).  This court has recently held that a union can unilaterally reaffirm an agreement
violative of s 8(e) merely by making a demand for compliance; actual compliance by the
signatory employer need not be shown. *Danielson v. International Organization of
Masters, Mates & Pilots,* 531 F.2d 747, 754 n.8 (2d Cir. 1975).

In *Carrier Air Conditioning,* the court stated, "We agree with the Ninth Circuit that a facially valid
agreement may be invalid for 8(e) purposes in particular factual contexts." id. at 1185.  The court
stated, "On an issue like this one, words in an agreement will often amount to little more than
routine recitations in anticipation of future litigation, such as the reference to work preservation in
the agreement in the instant case,…". id. at 1185.  The court refused to limit its consideration to
the words of the agreement and the circumstances surrounding the making of the agreement.
Thus, the court in *Carrier Air Conditioning* relied on conduct outside the 10(b) period to conclude
that a subcontracting clause which may have had a valid work preservation purpose as applied to
the installation of other plenums, "as applied to Moduline plenums part of a new type of air
conditioner the no subcontracting clause served only to aid Local 28 in 'trying to acquire work
performed by employees' of Carrier in Tyler, Texas.'" id. at 1187.

In the present case, the record reveals the 1975 agreement between BOMA and Local 1's
predecessors contained language pertaining to subcontractors requiring them to observe "the
economic terms and conditions of this Agreement, such as wages, hours and fringe benefits."
The Agreement allowed the union to file a complaint against the contractor for non-compliance,
provided a procedure for a hearing, and if it was found the complaint was well founded the
contract between the contractor and employer would be terminated.  The same subcontracting
language was contained in the parties 1982 to 1987 agreements.  No contracts were submitted
into evidence covering the period of 1988 to 2000.  Marcus' testimony reveals that there was a
period when maintenance of economic standards language was not in the contracts pertaining to
subcontracting, which resulted from a jurisdictional fight between two SEIU locals.  The testimony
of Marcus revealed that maintenance of economic standards language was removed from the
BOMA agreement around 1988, and union official Cliff testified that such language was not
reinserted until the late 1990's.  However, no agreement containing such language was entered
into evidence for the period covering 1988 until 2001.

Marcus testified that even during the period when there was no economic standards
provision in the BOMA contract for subcontractors some of the buildings on their own required the
contractor to deal with Local 1.  He testified, "I saw some of them that specifically said that you
must pay the rates and benefits that are contained in, or excuse me, you must deal with Local 1.
Some of the buildings have said that on their own."  Marcus testified there is "a widespread
practice in the city of Chicago in office buildings, and I have personally been involved in this
where, regardless of the contractor, whether it's security, plumbing, electrical, anything, that
before they enter into the contract they insist that they will have union personnel.  And the reason
they do that, is so that every, there won't be any threats of any work stoppage from anybody.
And those are buildings that don't even have contracts of any kind with the plumbers, with the
pipe fitters, with whoever, it's just their practice that they want union people working in the
buildings."

A subcontracting standards provision resurfaced in BOMA and Local 1's 2001 agreement
for security employees.  However, the prior language limiting the subcontractors' requirement to

the economic terms and conditions of the agreement was now replaced with a provision that read in Article XXIII that "any subcontractor that does not have a collective bargaining agreement with the Union, the Employer shall required that said contractor will meet all of the standards of this Agreement." The subcontract article also stated that, "In the event that the Employer subcontracts to a security contractor which is a party to a collective bargaining agreement with the Union, the terms and conditions of this Agreement shall be the only terms and conditions applicable to said contractor and its employees working in the Employer's buildings notwithstanding the particular terms and conditions contained in any collective bargaining agreement between the Union and such security contractor." Article XXIII in the 2001 BOMA Local 1 agreement did not reference the agreement's grievance-arbitration procedure. In fact, Article XVIII, Section 6 of the grievance arbitration procedure stated, "The grievance procedure set forth in this Article shall not apply to differences or disputes involving employees of contractors engaged by the Employer pursuant to Article XXIII which are subject to resolution under grievance procedures established by and between the contractor and the Union."

Ballenger, the security director for Local 1, credibly testified that Local 1 sought to enforce the subcontracting all standards provision in Article XXIII in 2003. Ballenger credibly testified a grievance was filed and it was Local 1's position that the economic terms and conditions pertaining to Article XXIII "means all the economics, the wage rates, the health and welfare, the pension – " and vacations. She explained that included payments to those SEIU funds contained in the contract. Ballenger testified there had been one contractor performing security work in BOMA buildings that was not signatory to a contract with Local 1. She testified it was Local 1's position that the subcontractor had to make payments, "to the union's funds and the economic terms, or benefit levels to the security officers." Ballenger testified that Local 1 filed a grievance against BOMA to make the subcontractor make the funds contributions. She testified the grievance was filed against BOMA because it was a non-signatory contractor. She testified, "it went to the grievance hearing with BOMA." She testified there was a meeting held between the building manager, SEIU, and BOMA. Ballenger testified that, as a result, the BOMA member employer operating the building put the security contract out for bid, obtained a union contractor, and replaced the non union contractor that had been servicing the building. Ballenger testified the employer got rid of the contractor, "Because they were a BOMA signatory building and they were bound by the BOMA agreement with Local 1." Ballenger testified that if the Article XXIII language was the same in the current contract as that which was contained in the contract in effect in 2003 then her interpretation of that language would be the same for the current agreement. Ballenger credibly testified the 2003 grievance went to the labor management committee.

BOMA and Local 1 strengthened the "all standards provision" in their 2004 agreement from that contained in the 2001 agreement. As in 2001, Article XXIII-Subcontracting included the following language, "any subcontractor that does not have a collective bargaining agreement with the Union, the Employer shall require that said contractor will meet all of the standards of this Agreement." As in 2001, Article XXIII in 2004 states that, "In the event that the Employer subcontracts to a security contractor which is a party to a collective bargaining agreement with the Union, the terms and conditions of this Agreement shall be the only terms and conditions applicable to said contractor and its employees working in the Employer's buildings notwithstanding the particular terms and conditions contained in any collective bargaining agreement between the Union and such security contractor." However, the 2004 version of Article XXIII now provided that grievances alleging that a contractor is not faithfully observing the terms of this agreement shall be processed in accordance with the grievance and arbitration procedures set forth in Article XVIII. If it is determined by the Committee in the third step or in subsequent arbitration proceedings between the Union and the contractor that the grievance is well founded and the contractor thereafter refuses to implement the remedy imposed, the contract

between the contractor and the Employer shall be terminated within sixty (60) calendar days after
written notice by the Union to the Employer.

5          Marcus testified contractors who have employees working in BOMA buildings regularly
participate in the BOMA grievance procedure.  Marcus testified that during the 2004 contract
there were between 35 and 40 grievances involving security personnel that made it to the labor
management committee and that, "every single contractor who participated in those, in that
procedure had a collective bargaining agreement of it's own with the SEIU."  Marcus testified that
10   according to the BOMA agreement, if the contractor is a signatory to an agreement with Local 1,
and they are working as a contractor in a BOMA signatory building the collective-bargaining
agreement that BOMA has negotiated prevails over whatever differences there are between that
contract and the contractor's own contract with Local 1.  Marcus testified the grievance procedure
established under the BOMA agreement supplants the grievance procedure in the contractor's
15   agreement.  He testified that while there were no grievances during the 2004 agreement alleging
that a contractor totally failed to abide by the terms of the BOMA agreement, there were
grievances alleging such things as failure to pay vacation pay.

          On September 13, 2006, BOMA distributed to BOMA employer members as well as to
20   security contractors who work in BOMA buildings a BOMA labor relations manual that contained
the following provision:

          If the subcontractor is not a party to an agreement with the Union, building shall require
          contractor to meet all of the stands of the BOMA/CHICAGO-SEIU, Local 1 Security
25        Agreement.

          Ballenger identified a contract that Local 1 had with Wackenhut with effective dates of
April 26, 2004, to April 29, 2007.  She testified the contract was no longer in effect at the time of
the hearing taking place on June 11 and 12, 2007, although Wackenhut was still working in
30   BOMA buildings.  The Wackenhut contract contains the following provision:

           If there is any conflict between the BOMA/SEIU Local 1 Security Collective Bargaining
          Agreement and this Agreement in BOMA Security Signatory Buildings, the parties to this
          Agreement agree that the BOMA/SEIU Local 1 Security Collective Bargaining Agreement
35        shall govern and agree to be bound by the terms and conditions of the BOMA/SEIU Local
          1 Security Collective Bargaining Agreement.

The Agreement Local 1 had with Wackenhut contained Article XXIV, Subcontracting allowing
Wackenhut to subcontract work under certain conditions, including that Wackenhut "require that
40   said contractor will meet all of the standards of this Agreement."[15]  Ballenger testified that all 25

────────────

[15]  The Wackenhut agreement contains the same subcontracting restrictions listed in the
BOMA agreement.  The Wackenhut agreement states, "In the event that the employer
subcontracts to a security contractor which is a party to a collective bargaining agreement with
45   the Union, the terms and conditions of this Agreement shall be the only terms and conditions
applicable to said contractor and its employees working in the Employer's building
notwithstanding the particular terms and conditions contained in any collective bargaining
agreement between the Union and such security contractor."  It states "Grievances alleging that a
subcontractor is not faithfully observing the terms of this Agreement shall be processed in
50   accordance with the grievance and arbitration procedures set forth in Article XIX."  It states if it is
determined in the proceedings the grievance is well founded and the subcontractor refuses to
implement the remedy imposed, the contract between the subcontractor and the Employer shall
                                                                                    Continued

contractors performing security work in BOMA buildings, with the exception of Wackenhut, had
signed an agreement with Local 1 similar to the one Wackenhut signed.

5          Ballenger testified she was familiar with the clause at issue in this proceeding, the all
standards clause, and that Local 1 took action to enforce the clause against Wackenhut.  She
testified that Local 1 filed a grievance against a BOMA building using Wackenhut and the
grievance was filed the week of the unfair labor practice trial.

10         I have concluded that Section 10(b) of the Act does not preclude the processing of the
complaint allegations in this case.  While the General Counsel has asserted that the all standards
subcontracting clause is ambiguous and therefore on its face does not constitute a union
signatory clause, extrinsic evidence reveals that such was the intent of BOMA and Local 1 by
incorporating the clause in their 2004 agreement.  Ballenger's testimony reveals that in 2003,
15  Local 1, filed a grievance against BOMA because one of its member buildings used a non union
subcontractor which was failing to make payments to Local 1's contractual fringe benefit funds.
Local 1 officials met with representatives of BOMA and the building management.  The grievance
was settled by having the offending contractor removed and replaced by a union contractor.
Thereafter, BOMA and Local 1 strengthened the subcontracting provision of the BOMA 2004
20  agreement, by making it enforceable in the contractual grievance procedure against an offending
subcontractor with the specific penalty of removal.  The BOMA agreement specifically states the
terms of the BOMA agreement supersede the terms of any agreement a contractor may have
with Local 1, and Marcus testified the BOMA grievance procedure applies to contractors who sign
agreements with Local 1, rather than the grievance procedure incorporated in the subcontractor's
25  contract.  Marcus, one of the principle negotiators to BOMA's agreement with Local 1, testified
that he was aware that many Chicago buildings only wanted to use union contractors to prevent
labor disputes.

           The Board has found subcontracting clauses requiring health and welfare plans to provide
30  a specific level of benefits to be violative of Section 8(e).  In this regard, the provisions do not
seek to preserve unit work for unit employees but seek to dictate the benefits payable to the
subcontractor's employers.  See, *Heavy, Highway, Building and Construction Teamsters, Et Al,*
227 NLRB 269, 273 (1976); and *District Council of Carpenters of Portland,* 243 NLRB 416, 423
(1979), holding that a provision requiring payment to a union's benefit funds in a subcontracting
35  provision is secondary in nature in that it is without regard to the whether the subcontractor is
already providing equivalent costs and benefits to its employees, and the payments to the funds
would not be used to the benefit of employees of the nonsignatory contractors, but rather for the
general membership participating in the funds.

40         In sum, in 2003 both BOMA and Local 1, have applied the all standards clause to
terminate a subcontractor who failed to make contractual fringe benefit funds.  Ballenger testified
she would apply the language in the current agreement in the same fashion.  Moreover, the
accompanying language to the all standards provision such as the requirement to use the BOMA
grievance procedure by subcontractor's employees and superseding of BOMA contractual
45  provisions to those of the subcontractor's contracts reveals that it was BOMA and Local 1's intent
to use the all standards provision as a union signatory clause.  I have concluded that within the
10(b) period BOMA reaffirmed the all standards provision by distributing a labor relations manual
to its members and subcontractors specifically incorporating the language of that provision.  I
have also concluded that Local 1 reaffirmed the all standards provision when during the very
50  week of the unfair labor practice trial; Local 1 filed a grievance against Wackenhut attempting to

_____

be terminated within (60) calendar days after written notice by the Union to the Employer.

enforce the provision.  Ballenger's testimony confirms the success of the signatory nature of the all standards provision when she testified that all of the approximately 25 security contractors performing work in BOMA buildings, except Wackenhut, had signed agreements with Local 1, and that those agreements required the terms of the BOMA agreement supersede the subcontractor's agreement with Local 1.  This conclusion is bolstered by the fact that language in predecessor agreements between BMA and the SEIU only required the contractors to adhere to the economic terms of those agreements, while the current language requires them to adhere to all standards of the agreement.

Thus, I have concluded that it was the intent of BOMA and Local 1 to use the all standards language as a union signatory provision, and that BOMA by distributing the labor relations manual in September 2006, and Local 1, by filing a grievance against Wackenhut in June 2007, reaffirmed or "entered into" the provision within the 10(b) period, See *Dan McKinney Co.,* 137 NLRB 649, 653-654 (1962); *Chicago Dining Room Employees,* 248 NLRB 604, 606 (1980); *District Council of Carpenters,* 243 NLRB 416, 418 (1979); *Milk Drivers & Dairy Employees, Local Union 537,* 147 NLRB 230, 231 fn. 3; *Heartland Industrial Partners,* 348 NLRB No. 72 (2006); and *Carrier Air Conditioning Co., v. NLRB,* 547 F.2d 1178, 1185-6, 1186 fn. 8 (2nd Cir. 1976).[16]  I find that BOMA's actions in maintaining and reaffirming the provision are violative of Section 8(e) of the Act. See, *Heavy, Highway, Building and Construction Teamsters, Et Al,* 227 NLRB 269, 273 (1976); and *District Council of Carpenters of Portland,* 243 NLRB 416, 423 (1979).

---

[16]  Local 1 argues in its brief that there must be bi-lateral conduct by parties to a contract within the 10(b) period in order to find a violation of the Act when a subcontracting clause is ambiguous on its face.  Local 1 cites *Sheet Metal Workers Local 27,* 321 NLRB 540 fn. 1 (1996), where the Board stated in passing that, "as a matter of law, solely unilateral conduct by a union, for example, a threat of picketing or the mere filing of a grievance, to enforce an unlawful interpretation of a facially lawful contract clause does not violate Sec. 8(e) because such conduct does not constitute an "agreement."  However, in *Sheet Metal Workers Local 27,* the Board noted that the Union's successful processing of a grievances driven by an unlawful interpretation of a facially valid subcontracting clause and the obtaining of an adjustment board award pursuant to those grievances constituted the requisite "agreement" for an 8(e) violation.  In the instant case, I have found that both BOMA and Local 1 attempted to enforce the all standards provision within the 10(b) period.  Moreover, rather than finding the provision to be benign and ambiguous, I have concluded that the history of the provision and other extrinsic evidence establish here it was the intent of BOMA and Local 1 to enforce the provision as a union signatory clause and they did so with stunning success.  I do not find Local 1's other citations pertaining to its Section 10(b) argument to be persuasive to the facts involved in the current dispute.  In *Local 1332, Int'l Longshoremen's Assn. AFL-CIO,* 151 NLRB 1447, 1450-1 (1965), the Board found that a clause was clear and unambiguous on its face in that it only applied to work that was historically and regularly that of ILA members.  The Board found the ILA's attempt to use the clause to obtain work that was not historically performed by its members was an attempt to force an employer association to enter into a new and different version of the clause.  Therefore, the union's action did not constitute a reaffirmation of an existing clause violative of Section 8(e) and there was no "entering into" the clause within the 10(b) period.  Similarly, in *Puget Sound District Council, Etc.,* 153 NLRB 547 (1965), the Board stated, "The natural reading of the contract clause in question does not bring it within the prohibition of section 8(e) and the clause was administered in accordance with its natural meaning.  The fact that Respondents contended at times that the clause meant something which would be within the prohibition of Section 8(e) is relevant to the section 8(b)(4)(A) issue, but does not support a finding that the clause violated Section 8(e)."  In the instant case, I have found that it was the intent of both BOMA and Local 1 to apply the all standards clause in an unlawful manner.

2. The security work is fairly claimable work
for bargaining unit employees

In *Teamsters Local 917 (Peerless Importers),* 349 NLRB No. 97, slip op. at 2-3 (2007), the
Board set forth the following principles regarding Section 8(e) allegations:

> Section 8(e) makes it unlawful for a union and an employer to 'enter into' an agreement
> expressly or implicitly requiring the employer 'to cease or refrain from handling, using,
> selling, transporting or otherwise dealing in any of the products of any other employer, or
> cease doing business with any other person.' Notwithstanding Section 8(e)'s broad
> wording, the Supreme Court has held that Section 8(e) does not prohibit all agreements
> that require an employer to cease doing business with another employer. The Supreme
> Court and the Board have long interpreted Section 8(e) to permit 'primary' agreements
> and to prohibit only 'secondary' agreements. A valid work-preservation agreement is a
> lawful primary agreement. *National Woodwork Mfrs. Assn. v. NLRB,* 386 U.S. 612, 644-
> 645 (1967). (Footnotes omitted.)

The Supreme Court has established the following analysis for determining whether an
agreement is a lawful work-preservation agreement:

> Whether an agreement is a lawful work preservation agreement depends on
> 'whether, under all the surrounding circumstances, the Union's objective was
> preservation of work for [bargaining unit] employees, or whether the [agreement
> was] tactically calculated to satisfy union objectives elsewhere …. The touchstone
> is whether the agreement or its maintenance is addressed to the labor relations of
> the contracting employer vis-à-vis his own employees.' *National Woodwork,* supra,
> 386 U.S. at 644-645. Under this approach, a lawful work preservation agreement
> *must pass two tests*: First, it must have as its objective the preservation of work
> traditionally performed by employees represented by the union. Second, the
> contracting employer must have the power to give the employees the work in
> question-the so-called 'right of control' test of *[ NLRB v. Pipefitters Local 638,* 429
> U.S. 507 (1977)].

It is the General Counsel and Wackenhut's position that the all standards clause is being
applied to work that is not fairly claimable by the BOMA contractual bargaining unit, and therefore
regardless of whether the clause is found to be a union signatory clause its application to
secondary employers is not work preservation and its maintenance and enforcement is violative
of Section 8(e) of the Act.  There was a dispute at the hearing as to who had the burden of proof
to establish whether the work was fairly claimable, with the General Counsel and charging party
asserting that it was BOMA's and relatedly Local 1's burden as parties to the contract, while
BOMA and Local 1 argued it was the General Counsel's burden to establish the work was not
fairly claimable in order to establish a statutory violation.

*a. Burden of proof as to fairly claimable work*

In the instant case, counsel for the General Counsel called no witnesses but rested after
entering into evidence the subcontract clause referred to as the all standards clause contained in
the BOMA's agreement with Local 1 providing that if a subcontractor is not a party to an
agreement with the Union, the building shall require the contractor to meet all of the standards of
the BOMA/CHICAGO-SEIU, Local 1 Security Agreement.  The General Counsel also, prior to
resting, obtained a stipulation that BOMA distributed a labor relations manual on September 13,
2006, to its member buildings and to security sub-contractors, wherein BOMA reiterated the
applicability of the all standards provision.  After the General Counsel and the Charging Party

21

rested, BOMA made a motion to dismiss, which was joined by Local 1. BOMA's premise, as articulated by its counsel at the hearing, was that it was the General Counsel's burden to establish that there was "no such preservation of work defense." (Tr. 33)  BOMA's counsel argued at the hearing that, as counsel for the General Counsel conceded, that the clause at issue is not unlawful on its face, and that the "General Counsel has said, if there is a valid work preservation basis for it, it is not unlawful at all.  And we would submit that in order to determine that is unlawful, it's incumbent upon General Counsel to establish that there was no valid work preservation." (Tr. 35-36).[17]  BOMA's counsel went on to state:

> …an agreement is unlawful under Section 8(e) if it, 1) is an agreement of the kind described in the basic prohibition of that section, eg. an agreement to cease doing business with another person; 2) it has a secondary as opposed to primary work preservation objectives; and 3) it is not saved by coming within the terms of the construction industry proviso.
>
>   It seems to me, and Respondent will assert, that those are the three elements that have to be established.  And obviously we don't have the third element at all in this case because the construction industry is not involved, but if those are the two elements that have to be established, General Counsel has established the first one and is totally silent with respect to the second.  We believe that is part of General Counsel's case.  It's not a part of our case. (Tr. 39).

I refused to grant the motion to dismiss at the hearing, but allowed BOMA and Local 1 to further plead the motion in their post-hearing briefs.  Both BOMA and Local 1 were given the option of not presenting a defense, and arguing that the case should be dismissed because the General Counsel had not met its burden of proof for a violation of the Act.  They were cautioned that if they provided evidence as to work preservation that if might be used in support of finding a violation.  They elected to go forward and provide evidence and have renewed their motion to dismiss in their post-hearing briefs.

In *Local 917, International Brotherhood of Teamsters,* 349 NLRB No. 97, slip op. at 3 (2007), the Board majority found that the agreement as issue as interpreted by an arbitrator impaired the business relationship between two entities.  The Board majority then stated unit employees had historically performed the work and stated, "as discussed above, the 'work preservation' defense has a second prong.  If the employer of the unit employees has lost control of the work, and such loss of control was not initiated by it or at its own volition, the work preservation defense is not valid one."  Referencing term work preservation as a defense clearly sends a signal by the Board that it is incumbent on a respondent to prove its validity.  Similarly, in *Glens Falls Building and Construction Trades Council,* 350 NLRB No. 42 (2007), the Board held that the complaint was not time-barred under Section 10(b) of the Act, in that the respondent unions reaffirmed and reentered into their February 20, 1992, letter agreement with Indeck by filing their state court breach-of-contract lawsuit.  The Board also affirmed the ALJ's finding that Indeck's promise to the respondents in the letter agreement, i.e., that Indeck's contractor on the project in question would deal only with subcontractors who had or would enter into a collective-bargaining agreement with the respondents, is within the scope of the prohibitions of Section 8(e) because it constitutes an implicit agreement by Indeck not to do business with another person-specifically, any contractor who would subcontract to nonunion subcontractors.  The Board stated that the central issue in the case was whether the otherwise prohibited letter agreement and the

---

[17] The complaint was only subsequently amended at the hearing to allege that the all standards clause was unlawful because it required a subcontractor to contribute to the fringe benefit funds included in the BOMA agreement.

Trades Council agreement were protected under the construction industry proviso of 8(e). The Board stated the Respondents bear the affirmative defense burden of proving proviso coverage. The Board has also stated the burden of proof in determining whether an employer is engaged
5    primarily in the building and construction industry lies with the party seeking to avail itself with that Section 8(f) statutory exception.  See, *Bell Energy Management Corp.,* 291 NLRB 168, 169 (1988); and *Painters, Local 1247 (Indio Paint & Rug Center)*, 156 NLRB 951 fn. 1 (1966).

In *Airline Pilots Association,* 345 NLRB 820, 822 (2005), it was stated:
10

Section 8(e) makes it unlawful for an employer and a union to 'enter into' an agreement expressly or implicitly requiring the employer 'to cease or refrain from handling, suing, selling, transporting or otherwise dealing in any of the products of any other employer, or cease doing business with any other person."
15    The Respondent's grievance and counterclaim have the clear object of forcing DHL/Airborne to cease doing business with ABX.  On its face, therefore, the Respondent's conduct is unlawful.

Counsel for the General Counsel argues in her brief that this pronouncement in *Air Line Pilots*
20    *Association* establishes that a prima facie violation of Section 8(e) is established by an agreement to cease doing business.  However, in *Airline Pilots Association,* the Board majority went to state, "Our analysis must go deeper.  As the Supreme Court has held, even if a contractual provision has a cease-doing business object, it is lawful if it or its enforcement 'is addressed to the labor relations of the contracting employer vis-à-vis his own employees."  The Board majority stated
25    that the assessment includes an analysis of the whether the work was "fairly claimable" by the union." id. at 822.  The Board did not address whose burden of proof it was to establish that the work was fairly claimable.  This issue was addressed more specifically in *Food & Commercial Workers Local 367 (Quality Food),* 333 NLRB 771, 772 (2001), a case involving a Section 8(b)(4)(ii)(B) allegation, the Board majority stated that, "To establish a work preservation defense,
30    a union must show that the employer had the right to control the assignment of the work.  Here, however, because the Respondent has failed to show that the work is fairly claimable, QFC's right to control the work is irrelevant."  Thus, the Board majority again framed the issue of work preservation as an affirmative defense to be proven by the respondent, which in that case was a union.  Similarly, in *Sheet Metal Workers Local 27,* 321 NLRB 540, 540 (1996), in finding that a
35    respondent union violated Section 8(e) of the Act, the Board noted, "the Respondent did not establish a valid work preservation claim to justify its interpretation of the subcontracting clause in the parties agreement."

BOMA, in support of its motion to dismiss, cited at the hearing *In re Bituminous Coal*
40    *Wage Agreements,* 756 F.2d 284 (3rd Cir. 1985).  The clause at issue in that case was different from the one in the instant case as it addressed trust fund payments required by the signatory employer if they were not made by the contractor and the court addressed scenarios where the application of the clause would be different based on a variety of circumstances.  The court did not address burdens of proof, particularly as to an NLRB proceeding involving the General
45    Counsel and a respondent since this was not a matter brought before the NLRB.  In any event, even had such a discussion occurred, I am bound Board law.  Given the difference of the clauses at issue, the fact that the matter was not related to an NLRB proceeding, and that the court did not address burdens of proof in a Section 8(e) proceeding vis-à-vis the General Counsel and a respondent, I do not find that decision instructive towards the outcome in the present case.  I also
50    do not find BOMA's citation to *United Mine Workers,* 179 NLRB 479 (1969) to be particularly helpful in the resolution of the issues in the current case.  That case involved the outcome of extensive litigation concerning the validity of certain provisions in the Mine Workers contracts peculiar to that industry where the Board majority found that the purchase of 'supplemental coal'

was insufficient to establish that the parties entered into the clause at issue for a secondary purpose. The Board majority concluded it was incumbent on the General Counsel in order to establish a prima facie case to produce evidence that the clause was actually applied to supplemental coal, to establish that the clause had a secondary application. The Board did not discuss burdens of proof therein as to right or control or whether work was fairly claimable. Similarly, BOMA's citation to *Heartland Industrial Partners,* 348 NLRB No. 72, slip op. at 4 (2006), is not persuasive. There the Board majority stated:

> The absence of record evidence, however, falls well short of meeting the General Counsel's burden of proving that the challenged clauses have a cease doing business object. Settled Board law requires us to construe a challenged clause 'to require no more than what is allowed by law' when it is not 'clearly unlawful on its face.' *General Teamsters, Local 982 (J. K. Barker Trucking Co.),* 181 NLRB 515, 517 (1970), affd. 450 F.2d 1322 (D.C. 1971).

Thus, *Heartland* merely enunciates the requirement that the General Counsel establish a cease doing business objective as its prima facie case. That is what the General Counsel contends here is its burden, and what Respondent's counsel conceded at the hearing has been met.

In *Local 917 International Brotherhood of Teamsters (Peerless Importers, Inc.),* 345 NLRB 1010 fn. 2, the Board stated that in deciding a motion to dismiss the standard is to "accept the complaint's factual allegations as true and construe the complaint in the light most favorable to the General Counsel." It was BOMA's position in its motion that it was the General Counsel's burden to establish that the work was not fairly claimable work as part of the General Counsel's case in chief. However, in making his argument for dismissal, BOMA's counsel labeled the work preservation as a "defense." (Tr. 33). BOMA's counsel also conceded the General Counsel had established the clause at issue had a cease doing business objective. (Tr. 39). After listening to the party's arguments and having studied cases provided to me, I concluded it was not appropriate to dismiss this case at the time of the hearing in that it was my ultimate obligation to determine whether BOMA and Local 1 engaged in lawful activity. (Tr. 65). The Board majority recently took a similar approach in a case involving Section 8(e) of the Act in *Local 917, International Brotherhood of Teamsters,* 349 NLRB No. 97, slip op. at 3 fn. 11 (2007), stating, "No party has excepted to the judge's statement that the General Counsel had the burden of proving that Peerless did not have the right of control over the disputed work. We conclude that a violation of Sec. 8(e) has been made out regardless of which party has the burden of proof on this issue."

I have concluded that a dismissal of this case because the General Counsel before resting failed to establish there was no work preservation defense is not warranted. In this regard, the Board has repeatedly referred to a work preservation claim as a defense to be established by the respondent. See, *Local 917, International Brotherhood of Teamsters,* 349 NLRB No. 97, slip op at 3 (2007); *Food & Commercial Workers Local 367 (Quality Food),* 333 NLRB 771, 772 (2001); and *Sheet Metal Workers Local 27,* 321 NLRB 540, 540 (1996). The Board has similarly found the assertion of the construction industry proviso as a defense to be incumbent on the party asserting it. *Glens Falls Building and Construction Trades Council,* 350 NLRB No. 42 (2007); *Bell Energy Management Corp.,* 291 NLRB 168, 169 (1988); and *Painters, Local 1247 (Indio Paint & Rug Center)*, 156 NLRB 951 fn. 1 (1966). Thus, I find the work preservation claim here is a defense and that it is incumbent on the party asserting it to establish it, in this case BOMA and Local 1. This is for two reasons. First they negotiated the contractual provisions in play which BOMA conceded at the hearing have a cease doing business object so it is incumbent upon them to establish it is for work preservation. Second, they also have readily available at their disposal the bargaining history, and employment history in the industry showing

whether the clause was one of work preservation.  I do not find persuasive BOMA's argument that if the General Counsel does not have to prove work preservation that the General Counsel would issue complaint in every Section 8(e) case based solely on contract provisions.  Not all
5   subcontracting provisions have a cease doing business objective.  Moreover, if a charged party cooperates in a Section 8(e) investigation, and establishes a valid work preservation defense then the General Counsel would have no basis to issue complaint.  This case is no different than any other as to whether a charged party elects to cooperate during an investigation.[18]

10      Counsel for BOMA conceded at the hearing and I find that the subcontracting provision here in dispute has a cease doing business objective.  This becomes all the more evident when the subcontracting provision is read in conjunction with the 2004 collective-bargaining agreements grievance arbitration provisions.  The pertinent provisions of the 2004 BOMA and Local 1 agreement read as follows: Article XXIII-Subcontracting of the 2004 agreement, provides
15   that, "any subcontractor that does not have a collective bargaining agreement with the Union, the Employer shall require that said contractor will meet all of the standards of this Agreement."  Article XXIII further provides that, "Grievances alleging that a contractor is not faithfully observing the terms of this Agreement shall be processed in accordance with the grievance and arbitration procedures set forth in Article XVIII.  If it is determined by the Committee in the third step or in
20   subsequent arbitration proceedings between the Union and the contractor that the grievance is well founded and the contractor thereafter refuses to implement the remedy imposed, the contract between the contractor and the Employer shall be terminated…".  Thus, I find that the General Counsel has established a prima facie case that the subcontracting provisions in dispute have a cease doing business objective.  Accordingly, the burden of proof shifts to BOMA and Local 1 to
25   establish that the clause was for the purpose of work preservation. See, *Airline Pilots Association,* 345 NLRB 820 (2005); *Local 917, International Brotherhood of Teamsters,* 349 NLRB No. 97, slip op at 3 (2007); *Glens Falls Building and Construction Trades Council,* 350 NLRB No. 42 (2007); *Food & Commercial Workers Local 367 (Quality Food),* 333 NLRB 771, 772 (2001); and *Sheet Metal Workers Local 27,* 321 NLRB 540, 540 (1996).

30

*b. Fairly claimable work for bargaining unit employees*

In circumstances where a union contracts with an employer association the Board will look to the custom and practice of the bargaining unit as a whole to determine whether the work in
35   dispute has been customarily performed by employees of employer members. See, *Bermuda Container Line, Ltd. v. Int'l Longshoremen's Assn.,* 192 F.3d 250, 256-7 (2nd Cir. 1999); *Sheet Metal Workers Union Local 162,* 207 NLRB 741, 748 (1973); Local 282, 197 NLRB 673, 675 fn.

40   _____

[18] Counsel for Local 1 also raised at the hearing a Section 10(b) argument in support of BOMA's motion to dismiss and argued there were advice memos issued which support her position.  Advice memos are just positions of the office of the General Counsel.  They do not constitute Board law and are not controlling here. See, *Glendale Associated, Ltd,* 335 NLRB 27,
45   34 (2001); and *Starlite Cutting, Inc.,* 280 NLRB 1071 fn. 3 (1986*).  Moreover, *Local 1332, Int'l Longshoremen's Assn. AFL-CIO,* 151 NLRB 1447, 1451 (1965), cited by Local 1, does not require a different result.  Rather, there the Board held the union was attempting to cause an association to enter into a new and different version of the litigated clause and that such conduct did not constitute a reaffirmation of an existing clause violative of Section 10(b) of the Act.  Thus, I
50   adhere to my decision not to dismiss the complaint after the General Counsel and Charging Party rested.  This is particularly so since I have found, as discussed above, that 10(b) is not a bar to these proceedings.

10 (1972); Teamsters; *United Mine Workers,* 179 NLRB 479, 483-4 (1969); and *Teamsters, Chauffeurs, Warehousemen & Helpers,* 172 NLRB 1037 (1968).[19]

5      Counsel for the General Counsel argues at page 6 of her brief that, "a contract clause restricting subcontracting in a multiemployer unit has a primary work preservation object if a majority of the work in question has traditionally been performed by employees in the multiemployer bargaining unit."  Counsel for the General Counsel further argues that in the instant case "since a vast majority of security work was not done by unit employees, but rather was being done by non-unit employees, security work was not fairly claimable 'unit work' by a wide margin.
10  Thus the ASP, when negotiated and agreed to, did not apply to unit work…".

      In *NLRB v. International Longshoremen's Ass'n, AFL-CIO (ILA I),* 447 U.S. 490, 505 (1980), the court stated "to determine whether an agreement seeks no more than to preserve the
15  work of bargaining unit members, the Board must focus on the work of the bargaining unit employees, not on the work of other employees who may be doing the same or similar work, …". The case was remanded to the Board when the court concluded the Board failed to properly analyze the work in dispute following technological change vis-à-vis the work previously performed by bargaining unit employees prior to the change.  In *NLRB v International*
20  *Longshoremen's Ass'n, AFL-CIO,* 473 US 61, 83 (ILA II) (1985), the court held that rules on containers were a lawful work preservation agreement whose enforcement did not have an unlawful secondary objective.  The court made this finding while noting that under the rules on containers, the ILA had given up some 80 percent of all containerized cargo work.

25      In *American Boiler Manufacture Assn. v. NLRB,* 404 F. 2d 547 (CA 8, 1968), cert. denied 398 U.S. 960 (1970), packaged boilers with trim piping attached were introduced and used in the St. Paul area before 1941.  The use of installation of packaged boilers increased rapidly and rose by 1963 to "sixty to eighty-five percent of all boiler installation."  Prior to the to the use of packaged boilers, the boilers and the trim piping were shipped separately and assembled on the
30  jobs site by members of the union.  In 1959 and 1961, the union tried unsuccessfully to obtain a clause in their agreement with the association requiring that trim piping be install by unit employees.  They obtained such a clause in 1963.  In upholding the contract clause the court stated:

35      Neither of the statements cited by the Association support the view that traditional work is limited to work which is currently, continuously and exclusively performed by the unit members.  Both statements refer to the possibility of acquiring new jobs or job tasks –jobs that had never been performed.
      We express no opinion as to whether a fabrication clause can be enforced if the
40  objective is to acquire work which unit employees had never performed or work which they may have performed in the past but have completely lost before the clause was negotiated.  We hold only that the term 'traditional work' includes work which unit employers have performed and are still performing at the time they negotiated a work-preservation clause.
45      It follows from the teachings of *National Woodwork* that a union can protect this work

---

[19] I do not find as persuasive Wackenhut's contention that since the bargaining unit has expanded over the years that at least some or many of the buildings will not have directly employed security employees and therefore the work is not fairly claimable by Local 1 for at least
50  those buildings.  Wackenhut has cited no case in support for this contention when multiemployer bargaining units are involved, and the case law set forth above instructs that the bargaining unit must be considered as a whole in determining whether work is fairly claimable.

by concerted activities where the objective is to affect the labor policies of the employer with whom they have a collective bargaining agreement. id. at 552.

* * *

5    To summarize, we hold that a collective bargaining agreement which seeks to preserve work currently being performed by unit employees and to reacquire that portion lost is not violative of Section 8(e). id. at 554.

In *Meat & Highway drivers v. NLRB,* 335 F.2d 709 (D.C. Cir. 1964), for at least 20 years,
10    meat packers in Chicago had agreed with a union that deliveries of meat products by truck within the Chicago area would be made directly by the packers, using their own equipment driven by their employees represented by the union. As a result of changes in the industry, the major packers moved much of their slaughtering and processing operations outside of Chicago. Of about 330 drivers employed by three of the major packers at the beginning of the prior
15    contract term in May 1958, only 80 were still employed 3 years later when negotiations began for a new agreement. Deliveries to customers within the Chicago area were increasingly being made by over-the-road drivers. The court held that delivery in the Chicago area, irrespective of origin of the shipment is work fairly claimable by the union in that it was work that employees in the bargaining unit had the skills and experience to do and a union is always free to bargain for
20    expansion of work opportunities. The court stated in the case before them was not work one of work acquisition but recapture.

*Teamsters, Chauffeurs, Warehousemen & Helpers,* 172 NLRB 1037 (1968), the Board majority held that Article 17 is a lawful wage standards provision designed to assure that Yolo
25    and other trucking concerns bound by the multiemployer contract do not perform unit work through outside contractors whose wage and fringe benefits costs are inferior to those of Yolo and other employers within the multi-employer unit. Yolo's work at issue was seasonable for that employer, which neither had the trucks nor manpower to perform the work itself, and Yolo had subcontracted the work for many years. In upholding the provision as applied to Yolo and its
30    subcontractor, the Board majority noted that the hauling contracted out entailed the same skills as held by Yolo's permanent work force and did not differ significantly from that historically performed in the multiemployer unit. It was noted that Yolo's permanent work force was occasionally called upon to perform the seasonal operations normally contracted out to subhaulers. Yolo had on its staff 12 trucks and 12 drivers. During the agricultural season it
35    increased its trucks and drivers up to 80 each by hiring owner operators and subcontracts. The Board majority held that the work subcontracted out to the charging party subcontractor work was fairly claimable by the Union.

In the present case, information gathered by BOMA, or its predecessor for the 1984
40    collective-bargaining agreement showed that there were 34 buildings covered by the agreement, that 31 buildings had in house security crews, and 3 buildings had both in house and contract employees. The summary showed there were 200 persons working for in house crews and there were six security employees working for contractors. Marcus testified that those individuals covered by the 1984 elevator operator and starter agreement were employed 100 percent by the
45    buildings and were always employed by the buildings. The elevator employees were eventually incorporated into the security employees bargaining unit. The summary compiled by BOMA from the building members for the 2001 contract negotiations with Local 1 shows that there were 139 signatory buildings for the 2001 agreement, the first agreement containing the all standards provision. The summary shows that for the 2001 negotiations there were 310 security personnel
50    employed directly by the buildings working in 45 buildings and there 900 individuals working for

contractors working in 106 buildings.[20]   The summary of information gathered by BOMA for the
negotiation of the 2004 contract, presently in dispute, showed there were 165 buildings signatory
to that contract.  The summary shows that for the 2004 agreement there were 38 buildings
directly employing 294 security personnel, and that there were 128 buildings using 1196.5
5    contractor employees as security personnel.   Ballenger testified that, at the time of the hearing
in June 2007, Local 1 represented about 500 security officers that work directly for the buildings,
and about 1500 who work for contractors.

10    Marcus testimony reveals that since at least since the 1980's to the present, Local 1 or its
predecessor locals had collective bargaining agreements with BOMA or its predecessors where
the collective bargaining units included security employees.  The earlier agreements contained an
economic standards clause for subcontracting.  As a result of a dispute with a competing SEIU
local, the economic standards clause was dropped from the association agreement until in all
15    probability the 2001 agreement, when it was replaced by the all standards provision at the heart
of the current dispute.  However, I do not find absence of an economic standards clause for a
period of time to be controlling here.  Rather, the issue as set forth by the Supreme Court is
whether the work in dispute has been traditionally performed by the bargaining unit to make the
work fairly claimable work. *NLRB v. International Longshoremen's Ass'n, AFL-CIO (ILA I)*, 447
20    U.S. 490, 505 (1980).

I have concluded that the work of security officers was traditionally performed by
bargaining unit members, and therefore the work is fairly claimable by Local 1.  In 1984, virtually
100 percent of the security work was performed by in house security employees.  While no

25    _____

[20] Marcus cited an example of some Lurie owned buildings where he testified that the security
services were contracted out to wholly owned subsidiaries of Lorie in an attempt to raise a joint
employer argument between building owners and security contractors.  However, Marcus testified
that the Lurie company was an exception the general rule, in that most BOMA buildings that
30    contract out security work do not contract the work to their subsidiaries, rather the work is
contracted to independent companies.  Along these lines, Caravelli was employed by JLL since
2001, and he is the director of security a building called One Financial Place managed by JLL.
Caravelli testified there are currently 22 security officers at One Financial Place, including one
site supervisor, six supervisors, and 16 security officers.  Caravelli testified that at One Financial
35    Place everyone on the security staff, except for Caravelli, is employed by a contractor, which is
Argus Security Services.  Caravelli testified he has been involved in the contractor's hiring
process of security employees, and that the building can tell the contractor to pay security officers
above the minimum contractual rates since the building pays the increase.  Caravelli testified if an
employee filed a grievance it would be between the employee and Argus, the subcontractor.
40    Caravelli has been involved with Argus promoting someone to supervisor.  He testified it is a joint
process.  However, Caravelli recommended a person for supervisor who was rejected for the
position by Argus.  Caravelli testified that Argus is the ultimate decision maker as to whether an
employee is to be disciplined.  Caravelli identified a list of 13 buildings in the Chicago area, which
he testified were managed by JLL.  He testified he was familiar with the security activities at some
45    of the buildings, but he was not asked and did not testify as to how any of the other buildings
were operated in terms of security, aside from One Financial Place.  Given, Marcus' admission
that most BOMA buildings do not contract out security services to their subsidiaries, and the
limited specifics provided about the operations of any but a few buildings, I do not find that BOMA
has raised a legitimate joint employer argument for security subcontractors operating in BOMA
50    buildings.  Moreover, even if there were a joint employer finding as to some of the security
contractors, it does not establish whether they or not they were persons under Section 8(e)'s
prohibitions.

statistics were presented for the period between 1984 and 2001, there is no contention and I have concluded that there was never a period when all of the work was completely contracted out. Rather, the evidence reveals that the number of BOMA building members continued to increase over the years, and the percentage of security work performed by bargaining unit employees continued to decline. Thus, there went from 34 signatory buildings in 1984, to 139 in 2001. In 1984, 100 percent of the buildings employed in house security employees. In 2001, approximately 32 percent of the buildings directly employed security officers, representing about 26 percent of the security officers employed in BOMA member buildings and the remainder of the work was contracted out. The summary collective for the 2004 agreement showed that about 23 percent of the member buildings used in house security personnel, representing about 25 percent of the security officers used in the buildings. Ballenger's testimony reveals that at the time of the hearing about 25 percent of the security work was performed by employees working directly for the buildings. I have concluded that the employees of employer members of the bargaining unit have traditionally and consistently performed such work over a lengthy period of time, and performed about 25 percent of such work at the time 2004 agreement, and it predecessor agreement were entered into. In these circumstances, the case law indicates, and I so find that the security work was fairly claimable by Local 1 for the BOMA bargaining unit. See, *NLRB v International Longshoremen's Ass'n, AFL-CIO,* 473 US 61, 83 (ILA II) (1985); *American Boiler Manufacture Assn. v. NLRB,* 404 F. 2d 547 (CA 8, 1968); *Meat & Highway drivers v. NLRB,* 335 F.2d 709 (D.C. Cir. 1964); and *Teamsters, Chauffeurs, Warehousemen & Helpers,* 172 NLRB 1037 (1968).

I do not find cases cited by the General Counsel to warrant a contrary result. In *Sheet Metal Workers Union Local 162,* 207 NLRB 741, 749 (1973), the Board approved the judge's finding of a Section 8(e) violation pertaining to the maintenance of a subcontracting provision. There the judge stated that:

Thus, while it has been shown that contractors can, and in some instances do, fabricate round pipe and fittings, this comes about only in exceptional situations and to meet special needs. If we are to establish a practice of custom and tradition in an industry, it must be shown that at least a majority of the commercial round pipe needs have been met by having the contractors regularly assign the fabrication to their own employees, or regularly purchase the disputed items from employers paying the construction local scale. The record here establishes the exact reverse. The regular pattern, with but few deviations, has been to have the round pipe needs on the commercial jobs met by purchase from mass production manufacturers whenever such items were available and I so find. Accordingly, I am satisfied and find that there is insufficient evidence to establish that the unit employees have ever engaged in the fabrication of round pipe items for use on jobs in excess of 3,200 square feet, with sufficient regularity or in the sufficiently recent past to support the assertion that such work is fairly claimable as unit work or entitled to be recaptures as unit work.

* * *

Here I have found that with only few exceptions, and these of a limited nature, the overwhelming majority of contractors have for a long period of time been purchasing their round pipe items from manufacturers, and not assigning the work of fabricating such items to unit employees. id. at 749-750.

In *Sheet Metal Workers Union Local 162,* the judge noted that of the 35 contractors who appear to engage in commercial work in excess of 3,200 square feet, the overwhelming majority purchase from 90 to 100 percent of the round pipe and fittings each uses on his construction jobs from mass production manufacturers, and this has been a continuous practice on the part of most of the contractors for periods ranging up to 20 years. The judge noted the contractors follow this

practice because they regarded the products purchased as substantially cheaper and better quality than it would be possible for most contractors to fabricate in their shops with the limited hand-operated equipment they possess. The judge stated, with but few exceptions, the contractors only fabricate round pipe fittings when the special needs of a particular job cannot be filled with items catalogued by manufacturers, or when catalogued items are not readily available on short notice.

While the judge in *Sheet Metal Workers Local 162,* used sweeping language that for custom and practice to be met at least a majority of the commercial round pipe needs must have been met by contractors regularly assigning such work to their own employees this pronouncement is contrary to the precedent cited above and not necessitated by the facts of the *Sheet Metal* decision itself where the judge found that, with few exceptions the contractors there only fabricated the work themselves when the job had special needs such that it could not be filled by the manufacturers, or when an order was needed on short notice. Such is not the case for the security work in the present case where there is a lengthy history of bargaining unit employees performing the work, and at the time of the contract in dispute still about 25 percent of it was performed in house.

In *Marine Officers Association,* 260 NLRB 1360 (1982), cited by the General Counsel, the union represented an employer's crews on boats for a period of 6 to 9 years. The employer then completely charted out the work for a 3 year period, with little protest by the union. The Board noted that the union had full knowledge in the change at the time it occurred, and that the union, "by sitting on its rights for almost 3 years after the complained-of conduct, must be deemed to have acquiesced to the Employer's change in operations." The Board stated that the union could no longer claim that its picketing in 1979 and 1980 had a work-preservation objective in that having acquiesced to the changes in 1977, the union no longer had a labor dispute with the employer. Similarly, in *Newspaper & Mail Deliverers (B & W Distributors),* 274 NLRB 929 (1985), an employer's drivers had not picked up disputed work for 10 years, and the union was aware of it for 6 years, during which it made no effort to secure the work. There it was concluded that by its acquiescence the union had waived any claim it might have had that its object in claiming the work was for work preservation. Thus, in both of these cases, cited by the General Counsel, there was a break in time when no bargaining unit employees performed the disputed work, and it was concluded that by the unions' acquiescence they had waived their claim to the work. Such is not present here, as the evidence reveals that a significant portion of the security work as been consistently been performed in house by crews employed directly by the buildings.

In sum, I find that the security work in dispute is fairly claimable for bargaining unit employees covered by the 2004 agreement negotiated between BOMA and Local 1. However, as set forth above, I have also found that BOMA has violated Section 8(e) of the Act by entering an agreement with Local 1 using the all standards clause as a union signatory clause.

CONCLUSIONS OF LAW

1. Respondent BOMA/Chicago (BOMA) and its employer members who are parties to the 2004 collective bargaining agreement with Service Employees International Union Local 1 (Local 1), are each employers within the meaning of Section 2(2) of the Act, and are engaged in commerce within the meaning of Section 2(6) and (7) of the Act.

2. Local 1 is a labor organization within the meaning of Section 2(5) of the Act.

3. By entering into, maintaining, and giving effect to a provision in the 2004 BOMA/Chicago-SEIU, Local 1 collective-bargaining agreement between BOMA, on behalf of certain employer members, and Local 1, specifically Article XXIII Subcontracting providing in pertinent part that "any subcontractor that does not have a collective-bargaining agreement with

the Union, the Employer shall require that said contractor will meet all of the standards of this agreement" and applying such provision to require subcontractors to observe and be bound by the agreement's requirements for payments into its fringe benefit funds and by otherwise in effect requiring security subcontractors as a condition of their contract to become signatories to an agreement with SEIU Local 1, BOMA has violated Section 8(e) of the Act.

4. The aforesaid unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act.

REMEDY

Having found Respondent BOMA has engaged in certain unfair labor practices, I shall I recommend that it cease and desist therefrom and take certain affirmative action designed to effectuate the policies of the Act.  Noting that: the all stands subcontracting language has been used as a union signatory clause, in that in 2003 a non-signatory union subcontractor was removed from a BOMA member building for failing to contribute to the contract's benefit funds; that all 25 current security subcontractors, save one, are signatories with Local 1; that a grievance was lodged against the one which is not under the all standards provision of the BOMA agreement; that the same all standards provision is incorporated in all of the subcontractors collective-bargaining agreements with Local 1, and that the subcontractors collective bargaining agreements require that they be bound by the terms of the BOMA agreement including its grievance procedure, regardless of what they have individually negotiated Local 1, I have concluded it was the intent of BOMA and Local 1 that the all standards language constitute a union signatory clause and therefore it should be expunged from the BOMA agreement with Local 1 and any successor agreements thereto.  Since I have found the security work is fairly claimable bargaining unit work, this remedy does not prevent BOMA and Local 1 from negotiating lawful and unambiguously non signatory subcontracting language for future agreements.

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[21]

ORDER

Respondent BOMA, its officers, agents, and representatives shall:

1. Cease and desist from:

(a) Entering, maintaining, or enforcing the provision in the 2004 BOMA/Chicago-SEIU, Local 1 collective-bargaining agreement, or its successor agreements, specifically Article XXIII Subcontracting providing in pertinent part that "any subcontractor that does not have a collective-bargaining agreement with the Union, the Employer shall require that said contractor will meet all of the standards of this agreement" in a manner that requires subcontractors to observe and be bound by the agreement's requirements for payment of monies into its fringe benefit funds, and in any other manner requiring the subcontractors to become signatory to a collective bargaining agreement with SEIU Local 1, or any other labor organization.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Remove the language that "any subcontractor that does not have a collective-bargaining agreement with the Union, the Employer shall require that said contractor will meet all of the standards of this agreement" from Article XXIII of the BOMA/ Chicago-SEIU Local 1, 2004

---

[21] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

collective bargaining agreement and any successor agreements, as well as any publications and labor relations manuals.

(b) Within 14 days after service by the Region, post at BOMA's offices and locations in Chicago, Illinois copies of the attached notice marked "Appendix." [22] Copies of the notice, on forms provided by the Regional Director for Region 13, after being signed by BOMA's authorized representative, shall be posted by the BOMA immediately upon receipt and maintained for 60 consecutive days in conspicuous places including all places where notices to employer members and employees are customarily posted. Reasonable steps shall be taken by BOMA to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the BOMA has gone out of business or closed its Chicago facilities, BOMA shall duplicate and mail, at its own expense, a copy of the notice to all persons who were employed by the BOMA, since September 13, 2006.

(c) Within 14 days after service by the Region of the attached notice marked "Appendix" said notice shall also be duplicated and mailed, at BOMA's expense, to all its current and former members since September 13, 2006, and to any subcontractors of those current and former members, who have provided security services for a BOMA member building since that date.

(d) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

(c) IT IS FURTHER ORDERED that the complaint is dismissed insofar as it alleges in theory that security work was not fairly claimable work for the collective-bargaining unit described in the 2004 BOMA/SEIU Local 1 collective bargaining unit.

Dated, Washington, D.C.   December 21, 2007

_____
Eric M. Fine
Administrative Law Judge

---

[22] If this Order is enforced by a Judgment of the United States Court of Appeals, the words in the notice reading "POSTED BY ORDER OF THE NATIONAL LABOR RELATIONS BOARD" shall read "POSTED PURSUANT TO A JUDGMENT OF THE UNITED STATES COURT OF APPEALS ENFORCING AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD."

APPENDIX
NOTICE TO EMPLOYEES

Posted by Order of the
National Labor Relations Board
An Agency of the United States Government

The National Labor Relations Board has found that we violated the National Labor Relations Act and has ordered us to post and abide by this notice.

WE WILL NOT enter, maintain, or enforce the provision in the 2004 BOMA/Chicago-SEIU, Local 1 collective-bargaining agreement, or its successor agreements, specifically Article XXIII Subcontracting providing in pertinent part that "any subcontractor that does not have a collective-bargaining agreement with the Union, the Employer shall require that said contractor will meet all of the standards of this agreement" in a manner that requires subcontractors to observe and be bound by the agreement's requirements for payment of monies into its fringe benefit funds, and in any other manner requiring the subcontractors to become signatory to a collective bargaining agreement with SEIU Local 1, or any other labor organization as a condition of performing security work for BOMA employer members.

WE WILL remove the language stated above from Article XXIII of the BOMA/ Chicago-SEIU Local 1, 2004 collective bargaining agreement and any successor agreements, as well as any publications and labor relations manuals, and notify all BOMA members, and security contractors of BOMA members in writing that his has been done by mailing them a copy of this notice as provided for in the Board's decision.

BUILDING OWNERS AND MANAGERS OF CHICAGO

_____

(Employer)

Dated _____ By _____

(Representative)               (Title)

The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. It conducts secret-ballot elections to determine whether employees want union representation and it investigates and remedies unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below. You may also obtain information from the Board's website: www.nlrb.gov.

209 South LaSalle Street, 9th Floor Chicago, Illinois 60604

Hours: 8:30 a.m. to 5 p.m.

312-353-7570.

**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE**
THIS NOTICE MUST REMAIN POSTED FOR 60 CONSECUTIVE DAYS FROM THE DATE OF POSTING AND MUST NOT BE ALTERED, DEFACED, OR COVERED BY ANY OTHER MATERIAL. ANY QUESTIONS CONCERNING THIS NOTICE OR COMPLIANCE WITH ITS PROVISIONS MAY BE DIRECTED TO THE ABOVE REGIONAL OFFICE'S COMPLIANCE OFFICER, 312-353-7170.

# Exhibit B

From the U.S. Code Online via GPO Access
[wais.access.gpo.gov]

TITLE 29--LABOR

CHAPTER 7--LABOR-MANAGEMENT RELATIONS

SUBCHAPTER II--NATIONAL LABOR RELATIONS

Sec. 158. Unfair labor practices


(b) Unfair labor practices by labor organization

It shall be an unfair labor practice for a labor organization or its
agents--

(4)(i) to engage in, or to induce or encourage any individual
employed by any person engaged in commerce or in an industry
affecting commerce to engage in, a strike or a refusal in the
course of his employment to use, manufacture, process, transport,
or otherwise handle or work on any goods, articles, materials, or
commodities or to perform any services; or (ii) to threaten,
coerce, or restrain any person engaged in commerce or in an
industry
affecting commerce, where in either case an object thereof is--
    (A) forcing or requiring any employer or self-employed
person to join any labor or employer organization or to enter
into any agreement which is prohibited by subsection (e) of this
section;
    (B) forcing or requiring any person to cease using, selling,
handling, transporting, or otherwise dealing in the products of
any other producer, processor, or manufacturer, or to cease
doing business with any other person, or forcing or requiring
any other employer to recognize or bargain with a labor
organization as the representative of his employees unless such
labor organization has been certified as the representative of
such employees under the provisions of section 159 of this
title: Provided, That nothing contained in this clause (B) shall
be construed to make unlawful, where not otherwise unlawful, any
primary strike or primary picketing;
    (C) forcing or requiring any employer to recognize or
bargain with a particular labor organization as the
representative of his employees if another labor organization
has been certified as the representative of such employees under
the provisions of section 159 of this title;
    (D) forcing or requiring any employer to assign particular
work to employees in a particular labor organization or in a
particular trade, craft, or class rather than to employees in
another labor organization or in another trade, craft, or class,
unless such employer is failing to conform to an order or
certification of the Board determining the bargaining
representative for employees performing such work:

Provided, That nothing contained in this subsection shall be

construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter: Provided further, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution;