IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THE WACKENHUT CORPORATION,

Plaintiff,

v.

SEIU LOCAL 1, THOMAS BALANOFF, MONA BALLENGER, EDWARD BOWEN, and ANDREW STERN,

Defendants.

Case No. 1:08-cv-2053

Judge Kendall/Magistrate Judge Schenkier

**RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

**PAGE**

I. INTRODUCTION ........................................................................................................ 1

II. THE STATUTORY AND NON-STATUTORY EXEMPTIONS DO NOT APPLY TO IMMUNIZE DEFENDANTS' ANTICOMPETITIVE RESTRICTION IN ARTICLE 23 OF THEIR AGREEMENT WITH BOMA. ............... 3

A. The Supreme Court's Decision in *Connell* Is Controlling and Dispositive of Defendants' Arguments Regarding the Statutory and Non-Statutory Exemptions. ......................................................................................... 3

B. Defendants' Arguments Regarding the Non-Statutory Exemption and Their Interpretations of the Applicable Case Law Should Be Rejected. ............... 8

C. The Subcontracting Restriction in Article 23 is Not Related Only to Wages, Hours and Working Conditions, and Its Anticompetitive Effect is Not Limited to or a Natural Result of the Standardization of Wages, Hours and Working Conditions. ....................................................................... 8

D. Defendants' Argument Regarding the Statutory Exemption and Their Interpretations of the Applicable Case Law Should Be Rejected. ....................... 13

III. COUNT IV IS NOT PREEMPTED BECAUSE THIS COURT HAS SUBJECT MATTER JURISDICTION TO HEAR THE CLAIM AND WACKENHUT ALLEGES COERCIVE CONDUCT BY DEFENDANTS. ......................................... 16

IV. CONCLUSION.......................................................................................................... 20

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Assoc. Builders and Contr., Inc. v. City of Seward*, 966 F.2d 492 (9th Cir. 1992) ........... 7

*Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100*, 483 F.2d 1154 (5th Cir. 1973) ........................................................................................ 17

*Connell Constr. Co. v. Plumbers & Steamfitters Local No. 100*, 421 U.S. 616 (1975) ................................................................................................*passim*

*Consolidated Express, Inc. v. N.Y. Shipping Ass'n*, 602 F.2d 494 (3d Cir. 1979) ........... 11

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568 (1988) ........................................................................ 20

*Feather v. United Mine Workers of Am.*, 711 F.2d 530 (3rd Cir. 1983).....................11, 17

*Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203 (1964) ............................ 2, 12

*Imperial Constr. Mgmt. Corp. v. Laborers Int'l Union Local 96*, 729 F. Supp. 1199 (N.D. Ill. 1990) ........................................................................................ 15

*Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982)..............................................2, 3, 6, 7

*Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676 (1965) .................................................... 17

*Mid-America Reg'l Bargaining Ass'n v. Will Cty. Carpenters Dist. Council*, 675 F.2d 881 (7th Cir. 1982)..........................................................................14, 15

*NLRB v. Servette, Inc.*, 377 U.S. 46 (1964)................................................................. 20

*Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612 (U.S. 1967)............................10, 12

*Shepard v. NLRB*, 459 U.S. 344 (1983) ........................................................................ 20

*United Rentals Highway Techs. v. Indiana Constr.*, 518 F.3d 526 (7th Cir. 2008) ..*passim*

*United States v. Utah Constr. Co.*, 384 U.S. 394 (1966) .................................................. 6

*Wickham Contr. Co., Inc. v. Bd. of Educ. of the City of New York*, 715 F.2d 21 (2d Cir. 1983)........................................................................................... 16

## STATUTES

29 U.S.C. § 158(b)(4)(ii)(A)........................................................................................ 2, 17

29 U.S.C. § 52 .................................................................................................................. 13

15 U.S.C. § 17 .................................................................................................................. 13

29 U.S.C. §§ 104-105 .......... 15
29 U.S.C. § 187(a) .......... 19

## I. INTRODUCTION

In a desperate attempt to avoid the clear reasoning and result in *Connell Construction Company v. Plumbers & Steamfitters Local No. 100*, 421 U.S. 616 (1975), Defendants in their motion to dismiss (1) disingenuously try to distance themselves from the plain language of Article 23 of their collective bargaining agreement with BOMA – the "hot cargo" provision which has already been found illegal by the NLRB, and (2) aggressively espouse an interpretation of case law on statutory and non-statutory exemptions that borders on the frivolous.

First, Defendants so want to avoid the language of Article 23 that they never cite or quote the entire section nor even the entire sentence that contains the "hot cargo" provision. That sentence provides: "With respect to any subcontractor that does not have a collective bargaining agreement with the Union, the Employer shall require that said contractor will meet all of the standards of this Agreement." Am. Compl. ¶ 24. Thus, the plain language of the sentence clearly provides that BOMA members should deal only with subcontractors who have an agreement with Defendant Local 1 and, if they choose to deal with a subcontractor that does not have an agreement with Local 1, they have to require that that subcontractor pay the same wages and benefits and follow the same grievance procedures as contained in the collective bargaining agreement between Local 1 and BOMA. This restriction, which by its plain language, is a limitation on subcontracting only with subcontractors that have an agreement with Local 1 and, thus, violates Section 8(e) – as the NLRB has already found – is not covered by any statutory or non-statutory exemption, as *Connell* clearly holds, and finally violates Sections 1 and 2 of the Sherman Act.

Furthermore, the lengths to which Defendants go in presenting their interpretation of the applicable case law, in order to try to make their arguments for the application of the statutory and non-statutory exemptions, are extraordinary to the point of bordering on the frivolous. For example, with respect to the non-statutory exemption, Defendants rely heavily on the Seventh Circuit's recent decision in *United Rentals Highway Techs. v. Indiana Construction*, 518 F. 3d

526 (7th Cir. 2008). However, *United Rentals* did not even address the issue of whether the non-statutory exemption applied in that case and instead relied entirely on the construction industry proviso contained in Section 8(e), which obviously does not apply to the instant case. In addition, Defendants also rely on the decision in *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203 (1964), for the proposition that subcontracting is one of the recognized mandatory areas of collective bargaining. However, contrary to Defendants' characterization of and reliance on *Fibreboard*, that case dealt with "contracting out" work that employees would do under a collective bargaining agreement, and did not deal with restrictions on subcontracting. Finally, Defendants undertake the above disingenuous and extraordinary lengths to avoid the clear result dictated by *Connell*, which rejects their arguments for the statutory and non-statutory exemptions.

Defendants' subject matter jurisdiction arguments, Defs. Mem. 12, mischaracterize Wackenhut's allegations, which do not claim violation of Section 8(e) of the NLRA alone. Rather Wackenhut alleges that it is entitled to damages based on Defendants' violations of "Sections 303, 8(b)(4), and 8(e) of the NLRA, as amended, 29 U.S.C. §§ 187, 158(b)(4), 158(e)." Am. Compl. ¶ 6. Defendants also ignore a long line of cases, including many cited in their own brief, where federal courts properly exercise jurisdiction over Section 303 claims based -- as here -- on allegations of a violation of Section 8(b)(4), which in turn is based on allegations of a violation of Section 8(e). Section 303 of the Taft-Hartley Act, 29 U.S.C. § 187(a), by incorporating by reference 29 U.S.C. § 158(b)(4)(ii)(A), forbids a union to "forc[e] or requir[e]" an employer to "enter into any agreement which is prohibited by 'the hot cargo' provision in 8(e)." *United Rentals*, 518 F.3d at 528-29. It is well established that unlike the incorporated provision of the NLRA, which is enforceable only by the Labor Board, section 303 is enforceable by suit in federal court. *See*, *e.g.*, *id.* at 529; *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 85 (1982). Thus, a suit such as this one alleging violations of Section 303 by way of Sections 8(b)(4) and 8(e) is within this Court's jurisdiction.

For the reasons stated above, and contained in this brief, this Court should deny Defendants' motion to dismiss.

## II. THE STATUTORY AND NON-STATUTORY EXEMPTIONS DO NOT APPLY TO IMMUNIZE DEFENDANTS' ANTICOMPETITIVE RESTRICTION IN ARTICLE 23 OF THEIR AGREEMENT WITH BOMA.

### A. The Supreme Court's Decision in *Connell* Is Controlling and Dispositive of Defendants' Arguments Regarding the Statutory and Non-Statutory Exemptions.

As indicated above, the Supreme Court's decision in *Connell* is dispositive of Defendants' argument that the non-statutory (and statutory) exemption applies to immunize the subcontracting restriction contained in Article 23. *Connell* is widely recognized by the Supreme Court itself and the lower courts as the seminal decision on the non-statutory exemption in general and, in particular, in connection with a restriction that violates Section 8(e) of the NLRA – or so-called "hot cargo" provisions. *See*, *e.g.*, *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 85 (1982). In addition, because *Connell* is one of the leading decisions dealing with a restriction that violates Section 8(e), it is also instructive regarding whether the statutory exemption applies to such a restriction.

In *Connell*, the Court held that the non-statutory exemption did not apply to the subcontracting restriction before it – which required contractors to subcontract only with subcontractors that had agreements with the union. The Court found not only that the non-statutory exemption did not apply to this subcontracting restriction, but also that the restriction violated Section 8(e).

In so holding, the Court discussed the non-statutory exemption extensively. The Court based its holding, in part, on the principle that "[l]abor policy clearly does not require…that a union have freedom to impose direct restraints on competition among those who employ its members." *Id.* at 622. Thus, the Court reasoned, "while the statutory exemption allows unions to accomplish some restraints by acting unilaterally, the nonstatutory exemption offers no similar protection when a union and a non-labor party agree to restrain competition in a business market." *Id.* at 623. The court further stated that "[c]urtailment of competition based on efficiency is neither a goal of federal labor policy nor a necessary effect of the elimination of competition among workers. Moreover, competition based on efficiency is a positive value that the antitrust laws strive to protect." *Id*. at 623.

*Connell's* facts are strikingly similar to the facts here and command the same result. The plaintiff Connell Construction Co. was a general building contractor that obtained jobs by competitive bidding and subcontracted all plumbing and mechanical work. *Id.* Connell followed a policy of awarding these subcontracts on the basis of competitive bids, and did business with both union and nonunion subcontractors. *Id.* In November 1970, Local 100 asked Connell to agree that it would subcontract mechanical work only to firms that had a current contract with the union. *Id.* When Connell refused to sign this agreement, Local 100 stationed a single picket at one of Connell's major construction sites. *Id.* at 620. About 150 workers walked off the job, and construction halted. *Id.* at 620. Connell then signed the subcontracting agreement under protest. *Id.* Finally, it filed a lawsuit claiming that the agreement violated Sections 1 and 2 of the Sherman Act. *Id.* at 620-21.

The Supreme Court held that the non-statutory exemption did not apply to the subcontracting restriction. *Id.* The Court found that the subcontracting agreement, which obligated general contractors to subcontract "only to firms that were parties to the union's current collective-bargaining agreement," *id.* at 619, "indiscriminately excluded nonunion subcontractors from a portion of the market, even if their competitive advantages were not derived from substandard wages and working conditions but rather from more efficient operating methods," *id.* at 623. Further the Court found that "Local 100 used direct restraints on the business market to support its organizing campaign." *Id.*

Similarly, in this case, Local 1 entered into a collective (or multi-employer) bargaining agreement with a non-labor association, BOMA/Chicago, that contained a sub-contracting clause (Article 23) like the one in *Connell*, as well as a "most favored nations" clause (Art. 24).[1] Thus, Article 23 states in pertinent part:

---

[1] Defendants contend that there is a distinction between *Connell* and the instant case – that the sub-contracting clause in *Connell* was in a separate document than the collective bargaining agreement, while here the sub-contracting clause is included in the collective bargaining agreement. Contrary to Defendants' contention, that distinction does not call for a different result than attained in *Connell*. That some of the provisions of the collective bargaining agreement between BOMA/Chicago and Local 1 addressed wages, hours and working conditions (Defs. Mem. 6) – in other words the labor market – does not diminish that the hot-cargo clause contained in Article 23 does not address the labor market and instead is directed to a business market. *See* discussion, *infra*, at pp. 10-12; *Connell*, 421 U.S. at 623 ("…the multiemployer bargaining agreement between Local 100 and the Association, though not challenged in the suit, [was] relevant in determining the effect that the sub-contracting agreement between Local 100 and Connell would have on the business market.").

> With respect to any subcontractor that does not have a collective bargaining agreement with the Union, the Employer shall require that said contractor will meet all of the standards of this Agreement.

Am. Compl. ¶ 24.

Like in *Connell*, here Article 23 first states that a BOMA member shall hire only subcontractors (providers of security services) that have an agreement with Local 1. Secondarily, Article 23 states that, if a BOMA member wants to hire a subcontractor that does not have an agreement with Local 1, the BOMA member must get the subcontractor to agree that it will pay wages and benefits that are the same as those contained in the collective bargaining agreement between Local 1 and BOMA/Chicago. This second part of Article 23 (as well as the first part) essentially forecloses competition among providers of security services and further would provide a competitive (or anticompetitive) advantage to those providers that have an agreement with Local 1, over those providers that do not have an agreement with Local 1. As such, the above subcontracting restriction in Article 23 violates Section 8(e).

Section 8(e) prohibits a union and an employer to agree that the employer will refuse to deal with any subcontractor that does not have a collective bargaining agreement with that union. *United Rentals*, 518 F.3d at 528 (Section 8(e) "forbids a union and employer to agree that the employer will refuse to deal with another employer (in this case a subcontractor), as Indiana Constructors has agreed with the Laborers Union to do with respect to United Rentals and any other subcontractor that does not have a collective bargaining agreement with that union."). Section 8(e) provides in pertinent part:

> It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases … or agrees to cease … doing business with any other person ….

It is clear from its plain language that Article 23 constitutes an agreement between Local 1 and BOMA/Chicago whereby BOMA/Chicago will cease or agrees to cease doing business with subcontractors – in this case, providers of security services – that do not have a collective bargaining agreement with Local 1. *See* ALJ Op. at 25 ("…I find that the subcontracting clause here in dispute has a cease doing business objective."). Indeed, if a BOMA member wants to hire a subcontractor that does not have a collective bargaining agreement with Local 1, then the BOMA member must get the subcontractor to agree to pay the same wages and benefits (and all

other standards) of the collective bargaining agreement between Local 1 and BOMA/Chicago. Thus, under this restriction, the BOMA member has no incentive whatsoever to hire a subcontractor that does not have a collective bargaining agreement with Local 1, if that subcontractor has to pay the same wages and benefits as a subcontractor that has a collective bargaining agreement with Local 1.

But it really does not matter what Wackenhut or Local 1 argue about whether Article 23 is an illegal "hot cargo" provision violating Section 8(e), because the NLRB has already found that Article 23 and its subcontracting restriction violate Section 8(e). *See* Am. Compl. ¶ 30. The ALJ held in pertinent part:

> By entering into, maintaining and giving effect to a provision in the 2004 BOMA/Chicago-SEIU, Local 1, specifically Article XXIII…[citing Art. 23 language quoted in 23] and applying such provision to require subcontractors to observe and be bound by the agreement's requirements for payments into fringe benefit funds and by otherwise in effect requiring security subcontractors as a condition of their contract to become signatories to an agreement with SEIU Local 1, BOMA has violated Section 8(e) of the Act.

Am. Compl. ¶ 31. While this response to Defendants' motion to dismiss is not necessarily the appropriate opportunity to raise the effect of the NLRB's decision in this case, that decision – finding that Article 23 violates Section 8(e) – has a collateral estoppel effect which bars Local 1 from contesting and re-litigating the Section 8(e) issue. *United States v. Utah Constr. Co.*, 384 U.S. 394, 422 (1966) (The decisions of administrative agencies may be given preclusive effect when the "administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate ….").

The NLRB's holding that Article 23 violates Section 8(e) is obviously highly significant for several reasons. First, since Article 23 violates Section 8(e), the non-statutory exemption cannot apply. Second, the NLRB's holding that Article 23 violates Section 8(e) establishes the first part of Plaintiff's Section 1 and 2 claims. The only element remaining for Plaintiff to establish is an anticompetitive effect on the relevant product market and injury in fact flowing from that anticompetitive effect.

The Supreme Court has held in at least two decisions that a finding that a contractual provision violates Section 8(e) also means that the non-statutory exemption does not apply to the provision. *See*, *generally*, *Connell*, 421 U.S. 616, and *Kaiser*, 455 U.S. 72 (also means that the

statutory exemption does not apply.) In *Connell*, the Court held that the subcontracting restriction there violated Section 8(e) and that the non-statutory exemption did not apply. *Connell*, 421 U.S. at 625, 626 (The subcontracting restriction "contravenes antitrust policies to a degree not justified by congressional labor policy, and therefore cannot claim a nonstatutory exemption from the antitrust laws," and "§ 8(e) does not allow this type of agreement.").

Likewise, in *Kaiser*, the Court stated that the reason that the Court in *Connell* first looked to the issue of whether the subcontracting provision violated Section 8(e) was that it needed to do so in order to first determine whether the provision was immune from the application of the antitrust laws. Thus, the Court in *Kaiser* stated: "In *Connell*, we decided the § 8(e) issue in the first instance. It was necessary to do so to determine whether the agreement was immune from the antitrust laws." 455 U.S. at 85. Applying the Court's reasoning in *Kaiser*, it follows that, if the provision violates Section 8(e), it is not immune from the application of the antitrust laws – in other words, the non-statutory exemption does not apply to the provision.

The reason that violation of Section 8(e) is equivalent to the non-statutory exemption not applying is because there can be no legitimate labor policy embodied in a contractual provision if it violates Section 8(e). This is, in turn, because Section 8(e) is Congress' expression that any provision that violates Section 8(e) cannot be consistent with legitimate labor policy. This reasoning has been set forth in several decisions, in addition to *Connell* and *Kaiser*. *See*, *e.g.*, *Assoc. Builders and Contractors, Inc. v. City of Seward*, 966 F.2d 492, 498-499 (9th Cir. 1992). In *Associated Builders*, the Ninth Circuit stated that an agreement that did not violate Section 8(e) as a result of the construction industry proviso was immune from the antitrust laws. *Id.* Thus, the court stated: " 'a valid subcontracting clause contained in a collective bargaining agreement cannot serve as the basis for an antitrust claim…because 'Congress would not have exempted the construction industry from the prohibition against 'hot cargo' clauses only to have such provisions create liability under antitrust laws.'…it would be inconsistent to approve such an agreement under labor law, but strike it down under antitrust law." Just as the Ninth Circuit held that a clause that was legal under Section 8(e)'s construction industry proviso was immune from the antitrust laws, so it follows that a contractual provision that violates Section 8(e) is not immune from the antitrust laws.

**B. Defendants' Arguments Regarding the Non-Statutory Exemption and Their Interpretations of the Applicable Case Law Should Be Rejected.**

In their attempt to apply the non-statutory exemption to Article 23, Defendants provide this Court with incomplete and one-sided interpretations of applicable case law. This Court should reject those interpretations and reject Defendants' arguments regarding the non-statutory exemption.

Defendants completely miss the point when they present their arguments in favor of the application of the non-statutory exemption. They argue that (1) the subcontracting restriction is only related to wages, hours and working conditions and therefore that it is addressed primarily to the labor market, (2) the elimination of competition is only with respect to wages, hours and working conditions and is a natural result of the standardization of wages, hours and working conditions (citing *Connell*), (3) the subcontracting restriction only serves to preserve the work of employees represented by Local 1, and (4) the elimination of competition is limited to the goal of such work preservation. Indeed, acceptance of Defendants' arguments would turn *Connell* and the antitrust laws (as applied to labor settings) on their heads. *Connell* was quite clear that the methods employed by the Defendants are not immune even if the goals that they have set forth were legal. As seen below, the goals espoused by the Defendants are not supported by the subcontracting restriction or by Defendants' actions and, more importantly, the anticompetitive effect of the subcontracting provision extends far beyond wages, hours and working conditions, is directed to a business market, and finally has a significant anticompetitive effect on that business market.

**C. The Subcontracting Restriction in Article 23 is Not Related Only to Wages, Hours and Working Conditions, and Its Anticompetitive Effect is Not Limited to or a Natural Result of the Standardization of Wages, Hours and Working Conditions.**

Contrary to Defendants' assertion, the subcontracting restriction in Article 23 is not limited to wages, hours and working conditions. More importantly, the anticompetitive effect of the subcontracting restriction is not limited to the standardization of wages, hours and working conditions. Once again, we look to *Connell* for the proper way in which to assess the effect of the subcontracting restriction here.

In *Connell*, the Court held that the subcontracting restriction was directed primarily at a business market and not a labor market because it eliminated competition in all subjects covered

by the multiemployer bargaining agreement, and not just on wages, hours and working conditions. After reviewing the language and effect of the subcontracting restriction, the Court noted that the multiemployer bargaining agreement between Local 100 and the Association, though not challenged in the suit, was relevant in determining the effect that the subcontracting agreement between Local 100 and Connell would have on the business market. *Connell*, 421 U.S. at 623. The Court found that the "most favored nation" clause in the multiemployer agreement promised to eliminate competition between members of the Association and any other subcontractors that Local 100 might organize. *Id.* By giving members of the Association a contractual right to insist on terms as favorable as those given any competitor, it guaranteed that the union would make no agreement that would give an unaffiliated contractor a competitive advantage over members of the Association. *Id.* Subcontractors in the Association thus stood to benefit from any extension of Local 100's organization, but the method Local 100 chose also had the effect of sheltering them from outside competition in that portion of the market covered by subcontracting agreements between general contractors and Local 100. *Id.* at 623-24. Therefore, the Court concluded that, in that portion of the market, the restriction on subcontracting would eliminate competition on all subjects covered by the multiemployer agreement, even on subjects unrelated to wages, hours, and working conditions. *Id.* at 624.

Likewise, in the instant case, Article 23, in conjunction with Local 1's organizing efforts and the "most favored nation" clause (Art. 24), operated to exclude from the Downtown Chicago security services market even competition unrelated to wages, hours and working conditions. Like in *Connell*, the agreement here "did not simply prohibit subcontracting to any nonunion firm; [it] prohibited subcontracting to any firm that did not have a contract with [this specific union]." *Id.* Moreover, the agreement went beyond wages and working conditions and also forced subcontractors to abide by its grievance procedure and pay into the union's fringe benefit funds "regardless of what they ha[d] individually negotiated with Local 1." *See* ALJ Op. at 31 (finding that Section 8(e) was violated by "applying [Art. 23] to require subcontractors to observe to and be bound by the agreement's requirements for payments into its fringe benefit funds and by otherwise in effect requiring security subcontractors as a condition of their contract to become signatories to an agreement with SEIU Local 1."). The Court recognized that "such control could result in significant adverse effects on the market and on consumers – effects unrelated to the union's legitimate goals of organizing workers and standardizing working

conditions." *Id*. at 624. For example, the *Connell* Court noted, "if the union thought the interests of its members would be served by having fewer subcontractors competing for the available work, it could refuse to sign collective-bargaining agreements with marginal firms." *Id*. at 624-625. Or, since Local 100 has a well-defined geographical jurisdiction, it could exclude "traveling" subcontractors by refusing to deal with them. *Id.* at 625. Local 100 thus might be able to create a geographical enclave for local contractors, similar to the closed market in *Allen Bradley*.

The same anticompetitive dangers are presented here. Even if Local 1's goal is only to organize as many subcontractors as possible, "the methods the union chose are not immune from antitrust sanctions simply because the goal is legal." *See id.* at 427. Here Local 1, like Local 100 in *Connell*, by agreement with BOMA, made nonunion subcontractors ineligible to compete for a portion of the available work. *Id.* at 428. The Supreme Court has declared that this kind of direct restraint on the business market has substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions. *Id.* "It contravenes antitrust policies to a degree not justified by congressional labor policy, and therefore cannot claim a nonstatutory exemption from the antitrust laws." *Id.*

The cases cited by Defendants do not contradict this position. Here, Local 1 was using Article 23 as a sword to monopolize all the security services jobs for itself instead of as a shield to preserve jobs. *See Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 630 n. 18 (U.S. 1967) (citing to Statement of Senator Ball, 93 Cong. Rec. 5011, II 1947 Leg. Hist. 1491, who described "one of the worst situations which has arisen, such as that in New York where a local of the IBEW is using the secondary boycott to maintain a tight little monopoly for its own employees, its own members, and a few employers in that area."). Article 23, by its terms and as applied, effectively required virtually all security services contractors in the Downtown Chicago office building market, whether or not their employees were Local 1 members, to abide by the standards in Local 1's collective bargaining agreement with BOMA/Chicago, which represents 81 percent of downtown's office buildings and nearly 90 percent of office space in its Class A buildings. Am. Compl. ¶¶ 17, 24. Consequently, to work in the Downtown Chicago market, a security services provider would just as well sign an agreement with Local 1 and thereby at least have an opportunity to negotiate its terms rather than have the BOMA/Chicago terms imposed on

them. Thus, Article 23 worked not only to fill Local 1's coffers with pension and other fund contributions from signatories and non-signatories alike, but also to increase its overall membership by pushing neutral subcontractors into a Hobson's choice: sign with Local 1, or refuse to sign and abide by the union's terms nonetheless. *See* ALJ Op. at 19 ("…the accompanying language to the all standards provision such as the requirement to use the BOMA grievance procedure by subcontractors' employees and superseding of BOMA contractual provisions to those of the subcontractors reveals that it was BOMA's and Local 1's intent to use the all standards provision as a union signatory clause.").

Defendants rely heavily on *United Rentals* as supporting their non-statutory exemption argument. However, contrary to Defendants' reliance, *United Rentals* did not even address the applicability of the non-statutory exemption. Instead, the issue in that case was whether the construction industry proviso in Section 8(e) would apply to a plaintiff that was arguably outside of the construction industry, namely traffic control. 518 F.3d at 529 (noting the "separate market in traffic control"), 530-33. The court analyzed whether traffic control workers were workers at a construction site and therefore covered by the construction industry proviso. *Id.* at 529-33. The court held that the restriction before it was covered by the construction industry proviso and therefore did not violate Section 8(e), and as such, did not violate the antitrust laws. *Id.* at 533.

Defendants also rely on *Feather v. United Mine Workers of America*, 711 F.2d 530 (3rd Cir. 1983) for the proposition that a clause that violated section 8(e) was still exempt under the non-statutory exemption. Defs. Mem. 9. However, once again, Defendants' reading of *Feather* is flawed and it actually supports Plaintiffs' claims on this motion to dismiss. In *Feather*, the court noted that, while a clause that violates Section 8(e) is not exempt when plaintiff makes an antitrust claim for injunctive relief,[2] another Third Circuit decision had held, after a bench trial, that a clause that violated Section 8(e) was exempt from an antitrust claim for damages. 711 F.2d at 542 (discussing *Consolidated Express, Inc. v. N.Y. Shipping Assn.*, 602 F.2d 494 (3d Cir. 1979), vacated and remanded on other grounds, 448 U.S. 902 (1980), modified, 641 F.2d 90 (3d Cir. 1981) (*Conex*)). However, that decision, *Conex*, first held that a plaintiff makes a prima facie case that the exemption does not apply when a clause violates Section 8(e). *Conex*, 602

[2] The court in *Feather* stated: "In *Connell*, the Supreme Court held that the non-statutory exemption did not shield a union when an employer sought injunctive and declaratory relief for injuries caused by the union's violations of section 8(e) of the Labor Act, the hot cargo provisions." 711 F.2d at 542.

F.2d at 521. *Conex* went on to say that the defendants could rebut that prima facie case if they could show that it was not foreseeable that the clause would violate section 8(e) and 8(b)(4). What *Conex*, which was after a bench trial, means here is that Plaintiff has made out its prima facie case and Defendants' motion to dismiss should be denied. In addition, unlike *Conex*, it was clearly foreseeable that here the subcontracting restriction in Article 23 violated Section 8(e).

Defendants' reliance on *National Woodwork Manufacturers* and *Fibreboard* is likewise misplaced. Contrary to the instant case, in *National Woodwork Manufacturers*, the union refused to hang prefabricated doors (the "hot cargo" at issue in that case) whether or not they bore a union label, and even refused to install prefabricated doors manufactured off the jobsite by members of the union. *Nat'l Woodwork Mfrs. Ass'n*, 386 U.S. at 646. This and other substantial evidence supported the Court's finding that the conduct of the union related solely to preservation of the traditional tasks of the jobsite carpenters. *Id.*[3]

The allegations here would not support an application of *National Woodwork*. In the instant case, unlike in *National Woodwork*, the goal of the subcontracting restriction in Article 23 is not the preservation of work for employees represented by Local 1 because the restriction specifically applies to employees who are not represented by Local 1. *See*, *e.g.*, ALJ Op. at 19 ("The Board has found subcontracting clauses requiring a specific level of benefits to be violative of Section 8(e). In this regard, the provisions do not seek to preserve unit work for unit employees but seek to dictate the benefits paid to subcontractors' employees.") (citations omitted).

Likewise, Defendants' reliance on *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 212 (1964), for the proposition that subcontracting may be considered a subject of mandatory bargaining, is based on an incorrect reading of that case. Contrary to Defendants' contention that it dealt with a restriction on subcontracting, *Fibreboard* dealt with a situation in which there was a restriction against contracting out to non-union employees work that was supposed to be done by the employees represented by the union. *Fibreboard*, 379 U.S. at 204-205 ("The primary issue is whether the 'contracting out' of work being performed by employees in the bargaining unit is a statutory subject of collective bargaining under those sections.").

[3] This decision is also inapposite because it involved an appeal of an NLRB decision applying Section 8(e) after a full evidentiary hearing – not a motion to dismiss – and is not an antitrust case.

Thus, a restriction against contracting out such work is not the same as a restriction, as here, against hiring a subcontractor that does not have an agreement with Local 1.

To the extent that Defendants cited *National Woodwork* and *Fibreboard* as support for their argument that the subcontracting restriction in Article 23 was aimed only at work preservation, their argument must fail because, as seen above, *National Woodwork* and *Fibreboard* are distinguishable and do not support Defendants' position. In addition, Defendants' argument that the subcontracting restriction in Article 23 is merely for work preservation must be rejected because the plain language of the restriction and its operation, all as supported by *Connell*, does not preserve work only for employees represented by Local 1. As noted above, the restriction here extends to employees not represented by Local 1 because it prohibits the hiring of a subcontractor that does not have an agreement with Local 1, or, at a minimum, takes away that subcontractor's ability to compete on any grounds. That the NLRB found that the security services work was "fairly claimable" by Local 1, Defs. Mem. 4, 8, is ineffectual with respect to Wackenhut's claims here, since the Board still found that Article 23 was an illegal union signatory clause in violation of 8(e), ALJ Op. 30. The only effect of the "fairly claimable" finding is that Local 1 and BOMA were not prevented "from negotiating lawful and unambiguously non signatory subcontracting language for *future* agreements." ALJ Op. 31 (emphasis added) ("I have concluded it was the intent of BOMA and Local 1 that the all standards language constitute a union signatory clause and therefore it should be expunged from the BOMA agreement with Local 1 and any successor agreements thereto."). Nothing in the NLRB decision mitigates the illegality of the version of Article 23 at issue here.

### D. Defendants' Argument Regarding the Statutory Exemption and Their Interpretations of the Applicable Case Law Should Be Rejected.

Defendants' arguments regarding the statutory exemption also fail. The basic sources of organized labor's exemption from federal antitrust laws are §§ 6 and 20 of the Clayton Act, 38 Stat. 731 and 738, 15 U.S.C. § 17 and 29 U.S.C. § 52, and the Norris-La Guardia Act, 47 Stat. 70, 71, and 73, 29 U.S.C. §§ 104, 105, and 113. *Connell*, 421 U.S. at 621. These statutes declare that labor unions are not combinations or conspiracies in restraint of trade, and exempt specific union activities, including secondary picketing and boycotts, from the operation of the antitrust laws. *Id.* at 621-22 (citing *United States v. Hutcheson*, 312 U.S. 219 (1941)). They do not exempt concerted action or agreements between unions and non-labor parties, as Defendants

urge in their motion, Defs. Mem. 9-11. *See id.* (citing *Mine Workers v. Pennington*, 381 U.S. 657, 662 (1965)).

In the face of the general rule that a union is not entitled to the statutory exemption if it engages in concerted action with a non-labor entity, Defendants argue that more than a collective bargaining agreement is needed in order to establish the requisite concerted action or combination with a non-labor entity, in order to remove the statutory exemption, relying on *Mid-America*, *Colfax* and *Imperial*. However, as with the other cases that Defendants rely upon throughout their arguments, their reliance on the above cases is based on their incorrect and selective reading.

Defendants rely heavily on *Mid-America Regional Bargaining Association. v. Will County Carpenters District Council*, 675 F.2d 881 (7th Cir. 1982), in support of its non-statutory exemption argument. However, *Mid-America* focused on the same issue – whether the agreement was directed to a business market, rather than the labor market – that the Supreme Court focused on in *Connell*. *See Mid-America*, 675 F.2d at 889 n. 20 ("…analysis of impact on the labor and business markets is identified in *Connell* as analysis appropriate to determining whether there is a basis for a nonstatutory exemption.") and *Connell* 421 U.S. at 622 ("The Court has recognized, however, that a proper accommodation between the congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in business markets requires that some union-employer agreements be accorded a limited nonstatutory exemption from antitrust sanctions."). This is hardly surprising since *Mid-America* must be consistent with *Connell*. In *Mid-America*, unlike *Connell* and unlike here, the agreement was not directed at a business market. Instead, the agreement was for the employers to pay into an account an amount equivalent to the increase in wages that the union was seeking but prior to the actual agreement on the increase in wages. This agreement was directed at wages and thus at the labor market. By contrast, a restriction that prohibits dealing with a non-union subcontractor is direct to a business market – the market that the subcontractor competes in (or is trying to compete in without the union's interference). Therefore, *Mid-America* cannot stand for a proposition of law different than *Connell*, and *Mid-America* cannot stand for a result different from that which *Connell* would dictate here, because *Mid-America* is based on distinguishable facts and *Connell* is based on nearly identical facts.

Moreover, *Mid-America* does not stand for the proposition that every collective bargaining agreement standing alone cannot provide the basis for the requisite concerted action or combination with a non-labor entity, in order to remove the statutory exemption. Instead, *Mid-America* states that a collective bargaining agreement standing alone cannot provide the basis for the requisite concerted action or combination with a non-labor entity, but only as long as the agreement pertains to subjects which are mandatory subjects of collective bargaining, such as wages, hours and working conditions. Where an agreement pertains to subjects which are not mandatory subjects of collective bargaining, the agreement itself can then become the requisite concerted action. Thus, the court in *Mid-America* stated: “Where collective bargaining agreements pertain to subjects which are not mandatory subjects of collective bargaining, some courts have held that the agreements can serve as evidence of a conspiracy. … the [statutory] exemption is lost when agreement is reached on topics such as prices, which are not proper subjects of collective bargaining.” 675 F.2d at 887 n.15 (citing the Supreme Court’s decision in *American Federation of Musicians v. Carroll*, 391 U.S. 99 (1968)). Thus, under *Mid-America*, if the collective bargaining agreement, as here, pertains to subjects that are not mandatory subjects of collective bargaining, then the statutory exemption does not apply. In addition, to the extent that *Colfax* and *Imperial* are based on *Mid-America*, they too must stand for, and cannot contradict, this same proposition.

Furthermore, it is clear that a restriction in a collective bargaining agreement – such as the subcontracting restriction contained in Article 23 here – that violates Section 8(e) cannot, by definition, pertain to subjects which are mandatory subjects of collective bargaining. This explains why *Connell* gave short shrift to the application of the statutory exemption to the subcontracting restriction there. Indeed, this is the interpretation set forth in *Imperial* which is cited and relied upon by Defendants. In *Imperial Construction Management Corp. v. Laborers International Union Local 96*, 729 F. Supp. 1199, 1210 (N.D. Ill. 1990), the court stated that “*Connell* implicitly assumed that such an allegation was sufficient to escape the statutory exemption when it gave short shrift to this exemption and proceeded to find that picketing outside of a collective bargaining relationship aimed at coercing the plaintiff to sign a subcontracting agreement was not within the nonstatutory exemption and was subject to the antitrust laws.” *Id.* (“The parties appear, however, to have overlooked an alternative way to plead a conspiracy and avoid the statutory exemption -- an allegation that defendants attempted to

agree, and did agree, with Imperial that Imperial's subcontracting would be limited to union subcontractors.").

Finally, requiring proof of conspiracy in the instant case would be contrary to the holding in *Connell* and Section 2 of the Sherman Act. In *Connell*, plaintiff asserted a claim for violation of Section 2, and thus, as to that claim, *Connell* did not involve any evidence of conspiracy. *See Connell*, 421 U.S. at 620-21 (plaintiff claimed "that the [subcontracting] agreement violated §§ 1 and 2 of the Sherman Act"); *Wickham Contracting Co., Inc. v. Board of Education of the City of New York*, 715 F.2d 21, 28 (2d Cir. 1983) ("*Connell* itself involved no evidence of any conspiracy between the defendant union and non-labor groups as the Court explicitly pointed out. 421 U.S. at 625, n. 2. The gravamen of the antitrust violation was the union's forcing of Connell into the offending agreement, not a conspiracy with non-labor groups to injure Connell."). In the instant case, as in *Connell*, Plaintiff has alleged a violation of Section 2 of the Sherman Act. Evidence of conspiracy is not required for a violation of Section 2, or for the statutory exception as applied to a Section 2 claim. If it was required, then the Supreme Court in *Connell* would not have found that the statutory exemption did not apply. So too, here, this Court should find that the statutory exemption does not apply to Plaintiff's Section 2 claim.

For the reasons stated above, the statutory exemption does not apply to the subcontracting restriction in Article 23.

## III. COUNT IV IS NOT PREEMPTED BECAUSE THIS COURT HAS SUBJECT MATTER JURISDICTION TO HEAR THE CLAIM AND WACKENHUT ALLEGES COERCIVE CONDUCT BY DEFENDANTS.

Defendants' subject matter jurisdiction arguments, Defs. Mem. 12, mischaracterize Wackenhut's allegations, which do not claim a violation of 8(e) alone. Rather Wackenhut alleges that it is entitled to damages based on Defendants' violations of "Sections 303, 8(b)(4), and 8(e) of the NLRA, as amended, 29 U.S.C. §§ 187, 158(b)(4), 158(e)." Am. Compl. ¶ 6. Defendants also ignore a long line of cases, including many cited in their own brief, where federal courts properly exercise jurisdiction over section 303 claims based on allegations of a violation of section 8(b)(4), which in turn is based on allegations of a violation of section 8(e).

A discussion of the interplay among Sections 8(e), 8(b)(4) and 303 plainly shows why Defendants' subject matter jurisdiction arguments fail. Section 8(e) was part of a legislative program designed to plug technical loopholes in Section 8(b)(4)'s general prohibition of

secondary activities. In Section 8(e) Congress broadly proscribed using contractual agreements to achieve the economic coercion prohibited by Section 8(b)(4). *Connell*, 421 U.S. at 628 (citing *Nat'l Woodwork Mfrs. Assn.*, supra, at 634). Section 8(b)(4)(B) makes it unlawful to enforce a 'hot cargo' clause already obtained. *Feather*, 711 F.2d at 536. In turn, Section 303 of the Taft-Hartley Act, 29 U.S.C. § 187(a), by incorporating by reference 29 U.S.C. § 158(b)(4)(ii)(A), forbids a union to "forc[e] or requir[e]" an employer to "enter into any agreement which is prohibited by "the hot cargo" provision in Section 8(e). *United Rentals*, 518 F.3d at 528-29. It is well established that, unlike the incorporated provision of the NLRA, which is enforceable only by the Labor Board, section 303 is enforceable by suit in federal court. *See*, *e.g.*, *id.* at 529; *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 85 (1982). Thus, a suit such as this one alleging violations of Section 303 by way of Sections 8(b)(4) and 8(e) is within the federal courts' jurisdiction.

That this Court may determine the merits of Count IV is further supported by *Connell*. As explained above, there the petitioner filed suit claiming that an agreement between it and the respondent union violated Sections 1 and 2 of the Sherman Act. Respondent contended that the agreement was exempt from the antitrust laws because it was authorized by Section 8(e). The Court of Appeals refused to decide whether Section 8(e) permitted the agreement or whether the agreement constituted an unfair labor practice under Section 8(e), holding that the NLRB "has exclusive jurisdiction to decide in the first instance what Congress meant in 8(e) and 8(b)(4)." *Connell Construction Co. v. Plumbers and Steamfitters Local Union No. 100*, 483 F.2d 1154, 1174 (5th Cir. 1973). The Supreme Court reversed on the ground that "the federal courts may decide labor law questions that emerge as collateral issues in suits brought under independent federal remedies, including the antitrust laws." 421 U.S. at 626. *See also Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 684-688 (1965). The Court then addressed the Section 8(e) issue on the merits and found that Section 8(e) did not allow the agreement at issue. 421 U.S. at 633. As a result, the agreement was subject to the antitrust laws, for the majority was persuaded that the legislative history did not suggest "labor-law remedies for § 8(e) violations were intended to be exclusive, or that Congress thought allowing antitrust remedies in cases like the present one would be inconsistent with the remedial scheme of the NLRA." *Id.* at 634. Likewise here, Wackenhut alleges violations of the federal antitrust laws and Section 8(e) (by way of Section 8(b)(4) and Section 303), which are both properly before this Court.

Moreover, here the allegations are supported by the NLRB's holding that Article 23 indeed violated Section 8(e), Am. Compl. ¶ 30, by using the clause as a union signatory clause or, in other words, forcing subcontractors to adhere to all of Local 1's terms (not just wages and working conditions) regardless of whether the subcontractor was a union signatory or, if a union signatory, what they had independently negotiated with the union. *See* ALJ Op. at 31 ("…the all standards subcontracting language has been used as a union signatory clause, in that …a non-signatory union subcontractor was removed from a BOMA member building for failing to contribute to the contract's benefit funds; that all 25 current security contractors, save one, are signatories with Local 1; that a grievance was lodged against the one which is not under the all standards provision of the BOMA agreement; that the same all standards provision is incorporated in all of the subcontractors collective bargaining agreements with Local 1, and that the subcontractors collective bargaining agreements require that they be bound by the terms of the BOMA agreement, including its grievance procedure, regardless of what they have individually negotiated with Local 1….") The following are just some of the other allegations from the Amended Complaint supporting this Court's jurisdiction of Count IV:

- "Plaintiff brings this action to recover damages, including treble damages, reasonable attorneys' fees, and costs of suit, arising out of Defendants' violations of… Sections 303, 8(b)(4), and 8(e) of the NLRA, as amended, 29 U.S.C. §§ 187, 158(b)(4), 158(e)." Am. Compl. ¶ 6.
- "This Court also has jurisdiction pursuant to Section 303(b) of the NLRA, as amended, 29 U.S.C. § 187(b)." Am. Compl. ¶ 7.
- "Local 1 has used the 'hot cargo' agreement against security services providers that failed to comply with all the standards contained in its Security Services Agreement with BOMA/Chicago. In at least one such instance, Local 1 and BOMA/Chicago terminated the security services provider." Am. Compl. ¶ 25.
- "***Local 1 also used the 'hot cargo' agreement to force*** BOMA/Chicago members to refuse to do business with Wackenhut or, if they ever allowed Wackenhut to bid on a security services contract, to force Wackenhut to charge the same rates – those contained in Local 1's Agreement with BOMA/Chicago – as all other security services providers in Chicago." Am. Compl. ¶ 26 (emphasis added).

- "Defendant Local 1's conduct and activity described herein also violated Sections 8(e) and 8(b)(4) of the NLRA, as amended, 29 U.S.C. §§ 158(e), 158(b)(4)…." Am. Compl. ¶ 34.
- "From April 26, 2004, through April 29, 2007, and also prior to that period, through the "hot cargo" agreement in Local 1's Agreement with BOMA/Chicago, Local 1 restrained, suppressed and eliminated competition in the market for security services in Downtown Chicago. Through the "hot cargo" agreement, ***Local 1 forced*** building owners and managers in the Chicago market, who are Wackenhut's neutral customers and prospective customers, to subcontract only with Local 1 signatory security services companies." Am. Compl. ¶ 71 (emphasis added).
- "The conduct and activity of Local 1 herein violated Sections 8(e) and 8(b)(4) of the NLRA, as amended, 29 U.S.C. §§ 158(e), 158(b)(4). As a direct and proximate result of the illegal conduct of Local 1, as described above, Plaintiff Wackenhut has been injured in its business and property and has suffered actual damages for lost profits, increased overhead, direct expenses, legal costs and lost business opportunities." Am. Compl. ¶ 78.
- "…That the Court grant Plaintiff damages in the sum found to have been sustained by the Company as a result of and in consequence of Defendant's unfair labor practices, pursuant to 29 U.S.C. § 187." Am. Compl. at 18.

Together these allegations satisfy the jurisdictional requirements of Section 303. In *United Rentals*, for example, the Seventh Circuit was satisfied that it had jurisdiction over the Section 303 claim based on plaintiff's allegation that defendants had violated Section 8(e). *United Rentals*, 518 F.3d at 528-29. There the plaintiff did not allege any additional forms of coercion other than the imposition of the agreement alleged to violate Section 8(e). Although the court ultimately determined that the agreement did not violate Section 8(e), it was nonetheless

competent to make the determination either way.[4] Likewise, this Court is fully competent to hear Count IV.

## IV. CONCLUSION

For the foregoing reasons, Wackenhut respectfully requests that this Court enter an order denying Defendants' Motion to Dismiss and granting any other relief it deems just and appropriate.

Respectfully submitted,

/s/ PATRICK J. AHERN
**BAKER & MCKENZIE LLP**
Patrick J. Ahern (ARDC# 6187380)
patrick.j.ahern@bakernet.com
John N. Raudabaugh (admitted *pro hac vice*)
john.n.raudabaugh@bakernet.com
Karen Sewell (ARDC# 6284417)
karen.sewell@bakernet.com
130 E. Randolph Dr., Suite 3500
Chicago, Illinois 60601
312.861.8000

---

[4] Puzzlingly, Defendants cite to the *United Rentals* district court decision and its finding regarding ultimate liability under Section 8(b)(4) in support of its argument that this court lacks subject matter jurisdiction. (Defs. Mem. 12). Surely Defendants cannot be arguing that the standard for determining liability under a statute is the same one applied to determine subject matter jurisdiction. Contrary to Defendants' implication, the *United Rental* decisions, both district and appellate, did not hold that subject matter jurisdiction was lacking. As for Defendants' reliance on *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Construction Trades Council*, 485 U.S. 568 (1988), *Shepard*, 459 U.S. at 351 and *NLRB v. Servette, Inc.*, 377 U.S. 46 (1964), Defs. Mem. 13, none of those cases even address the federal court's subject matter jurisdiction over Sections 8(b)(4) and 8(e), or Section 303 claims.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of August, 2008, a copy of the foregoing Joint Initial Status Report was filed electronically with the Clerk of the Court was served via the CM/ECF system upon all counsel of record in this case. A courtesy copy of this report was also delivered to the courtroom deputy's office in Room 2316-A of the Dirksen Building.

/s PATRICK J. AHERN
Patrick J. Ahern
Counsel for Plaintiff
The Wackenhut Corporation